J-A11026-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| P.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| L.B.M. | |
| Appellant | No. 3421 EDA 2015 |

Appeal from the Order Entered November 10, 2015
In the Court of Common Pleas of Delaware County
Domestic Relations at No(s): 2000-014826

BEFORE:  SHOGAN, J., MUNDY, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.:                **FILED June 24, 2016**

Appellant, L.B.M. (Mother), appeals from the November 10, 2015[1] order granting the petition for modification of the existing custody order and the petition for relocation filed by P.M. (Father), with respect to the parties' son, D.M., born in January 1999.  After careful review, we affirm.

The trial court set forth the extensive procedural and factual history of this case in its November 10, 2015 order, which the testimonial and documentary evidence supports.  As such, we adopt it herein.  **See** Trial Court Order, 11/10/15, at 1-22.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The trial court's order is dated November 9, 2015, but was filed on November 10, 2015.

Relevant to this appeal, Father filed the respective petitions on April 14, 2015, in which he requested legal and primary physical custody of D.M., then age sixteen, and a sophomore in high school. D.M. resided all of his life with Mother in Villanova, Delaware County, Pennsylvania. Father resided in the State of California "on and off since 1999." N.T., 8/26/15, at 62. At the time of the subject proceedings, he resided in Bonita, California, a suburb of San Diego, with his wife and her son.

The existing custody order, dated November 8, 2013, granted the parties shared legal custody. The order granted Mother primary physical custody, and Father partial physical custody for ten days following the end of the school year, and for three consecutive weeks prior to the beginning of the school year. The order also set forth Father's periods of partial physical custody during holidays.[2]

In his petition, Father alleged that D.M. "[wa]s being suspended and presumably terminated from the Radnor School District for the balance of his academic career," as the result of an incident in February or March of 2015, when D.M. gained unauthorized access to and harmed the Radnor School District's computer network. Petition for Relocation, 4/14/15, at ¶ 11; Petition for Modification, 4/14/15, at ¶ 6; Trial Court Order, 11/10/15, at 8, n 7. In addition, Father alleged that D.M. interfered with the Radnor High

---

[2] The Honorable Barry C. Dozor, who presided over the subject proceedings, issued the November 8, 2013 custody order following an evidentiary trial.

School computers in March 2014, resulting in the computers "being confiscated by the Radnor Police[.]" Petition for Modification, 4/14/15, at ¶ 5(b). Father further alleged, "Mother cannot control [D.M.,] and [D.M.] is potentially very dangerous with his enhanced computer skills and knowledge in an unsupervised environment[.]" *Id.* at ¶ 8.

A trial occurred on Father's petitions on August 26, 2015, and September 11, 2015, during which Father testified on his own behalf. In addition, Father presented the testimony of his wife, G.M., and his sons from his first marriage, Je.M., then age 29, and Ju.M., then age 31.[3]

Mother testified on her own behalf, and presented the testimony of Michael Wilson, the Director of Government Relations and Outreach at the Commonwealth Connections Academy, a cyber school where she enrolled D.M. in March 2015. Further, Mother presented the testimony of George Torrey, whom she employed in January 2014 to tutor D.M. in math. In lieu of testimony, Mother introduced into evidence letters from H.C., the mother of a friend of D.M., and C.R. and S.G., family friends.

The trial court interviewed D.M. *in camera* in the presence of counsel. D.M. testified that he wanted to continue living with Mother. **See** N.T., 9/11/15, at 155. Further, the trial court introduced into evidence the

_____

[3] Father has four adult sons from his first marriage. Trial Court Order, 11/10/15, at 6, ¶ 10.

- 3 -

psychological evaluation of D.M. performed by V. Richard Roeder, Ph.D., in June 2015.

On November 10, 2015, the trial court granted the parties joint legal custody,[4] Father primary physical custody to begin no later than November 28, 2015, and Mother partial physical custody for seven weeks during the summer. Further, the trial court ordered D.M. to attend a minimum of five individual counseling and therapy sessions to assist him in his "relocation to California, his self-esteem, or other personal issues." Trial Court Order, 11/10/15, at 44.

On November 12, 2015, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). The trial court filed a Rule 1925(a) opinion on December 3, 2015.

On appeal, Mother presents the following issues for our review.

> 1. Whether the [t]rial [c]ourt erred and/or abused its discretion in failing to consider the possible harm to [D.M.] in uprooting him from the care pattern he has known from a young age[?]

---

[4] We observe that the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340, does not use the term "joint legal custody." *See generally* 23 Pa.C.S.A. § 5322(a). Here, we refer to the court's legal custody award as "shared legal custody." *Id.*

2. Whether the [t]rial [c]ourt erred and/or abused its discretion in disregarding [D.M.]'s preference to remain in [] Pennsylvania with his mother[?]

3. Whether the [t]rial [c]ourt erred and/or abused its discretion in analyzing the factors enumerated in [23] Pa.C.S.A. § 5328(a) and § 5337(h)(1)-(10) as the [trial] court's analysis, findings of fact and conclusions of law are not supported by the record[?]

Mother's Brief at 9.

Mother argues that the trial court abused its discretion by (1) failing to weigh the benefits to D.M. of relocating to California against "the possible harm [he] would suffer by uprooting him from the care pattern he has known from a young age"; (2) disregarding D.M.'s preference to remain in Pennsylvania; and (3) failing to weigh the statutory best interest factors, 23 Pa.C.S.A. § 5328(a)(3) and (10), and the statutory relocation factors, 23 Pa.C.S.A. § 5337(h)(1), (2), and (7), in favor of Mother. *Id.* at 15.

Our scope and standard of review in custody matters is as follows.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. **Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.** We may reject the conclusions of the trial court only if they involve an error of law, or are

- 5 -

> unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted) (emphasis added).

Further, we have stated the following.

> [T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006), *quoting Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004).

Pursuant to the Act, in considering modification of an existing custody order, "a court may modify a custody order to serve the best interest of the child." 23 Pa.C.S.A. § 5328(a). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006), *quoting Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004). Section 5328(a) provides the following enumerated list of factors a trial court must consider.

> **§ 5328. Factors to consider when awarding custody.**
>
> **(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted

consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In the instant case, as neither Father nor Mother was seeking to relocate, but only D.M. would be moving a significant distance if Father's petition for modification was granted, this circumstance "does not *per se* trigger [S]ection 5337 of the … Act." ***D.K. v. S.P.K.***, 102 A.3d 467, 477 (Pa. Super. 2014). Nevertheless, we have held, "[t]rial courts should still consider the relevant factors of [S]ection 5337(h) in their [S]ection 5328(a) best interest analysis." ***Id.*** at 477-478. We have explained, "several of the relevant factors of [S]ection 5337(h) are encompassed, directly or implicitly,

by the custody factors listed in [S]ection 5328(a). Any relevant [S]ection 5337(h) factor that is not expressly encompassed in [S]ection 5328(a) should be considered by the trial court under the catchall provision of [S]ection 5328(a)(16)." *Id.* at 478. The Section 5337(h) relocation factors are as follows.

> **§ 5337. Relocation**
>
> **(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> > (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
> >
> > (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
> >
> > (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
> >
> > (4) The child's preference, taking into consideration the age and maturity of the child.
> >
> > (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

In its November 10, 2015 order, the trial court recited and reviewed all of the Section 5328(a) best interest factors and all of the Section 5337(h) relocation factors. *See* Trial Court Order, 11/10/15, at 23-39. In its Rule 1925(a) opinion, the trial court addressed Mother's asserted errors.

With respect to her assertion that the court failed to consider the possible harm to D.M. by "uprooting him from the care pattern he has known from a young age," the court disagreed and explained in part as follows.

> Under this care pattern [D.M.] has repeatedly engaged in a course of conduct that has led to multiple disciplinary actions from his schools, and ultimately led to his removal from Radnor School

- 10 -

District as well as the filing of criminal charges against him. This care pattern by Mother also included the exclusion of Father from all major life decisions and the alienation of Father and Father's family from [D.M.]. Mother has also repeatedly exercised poor judgment. Mother has consistently ignored the requirements of [shared] legal custody by refusing to seek legally required [] approval [from Father] before making decisions for [D.M.]. Mother also, by her own admission, provided [D.M.] with 'every single document' generated in connection with this custody case….

The estrangement of [D.M.] from Father, as a direct result of Mother's actions, has undoubtedly harmed [D.M.], Father and [D.M.]'s relationship, and their ability to communicate.

Trial Court Opinion, 12/3/15, at 30. With respect to the benefits to D.M. in relocating to live with Father, the trial court found as follows.

These benefits are numerous and significant, and include Father's expertise in the field of computer technology and his ability to mentor [D.M.] about computer technology, the chance to live and learn in California which is renowned for its central role in the world of technology, [D.M.'s] opportunity to attend a high school that would provide him with social interaction, with both peers and teachers, as well as more contact with members of Father's family[.]

*Id.* at 29.

The trial court addressed D.M.'s preference to remain in Pennsylvania with Mother and found, "that while [D.M.] would prefer to remain in Pennsylvania with Mother[,] it is not in his best interests to do so. [D.M.]'s best interests are better served by living in California with Father than to continue living in Pennsylvania with Mother. Th[e trial c]ourt also

determined that [D.M.]'s pattern of misconduct, and even criminal activity, illustrated that his maturity, judgment, and decision-making skills are questionable." ***Id.*** at 24. The trial court concluded that D.M. moving to California with Father was in D.M.'s best interests.

> [T]h[e trial c]ourt determined that Mother was unable to provide competent guidance in the area of computers and ethics regarding computer systems which th[e trial c]ourt determines is necessary. … Th[e trial c]ourt notes that Mother herself continued to testify that she was not technologically savvy and the record is well developed that Father is more than competent in this area to assist [D.M.]. Father … due to his background in the field of computer technology, is both willing and able to provide [D.M.] with continuing guidance, education, and supervision about not only computer technology but also the responsibilities that come along w[ith] using technology. Father is also uniquely capable of helping [D.M.] because he has had custody of the four older boys who have had similar issues, including an addiction to computers/gaming. All of the older boys are now flourishing and enjoy a close relationship with their Father and Father's family despite the circumstances that they experienced.

***Id.*** at 26.

Finally, with respect to Mother's assertion that the trial court failed to properly weigh the Section 5328(a) best interest factors and the Section 5337(h) relocation factors, the trial court disagreed. Specifically, the trial court emphasized its thorough consideration of all of the requisite statutory factors in light of the testimonial and documentary evidence, as well as its credibility and weight of the evidence findings against Mother, which fall within the sole province of the trial court. ***See A.V. v. S.T.***, 87 A.3d 818,

- 12 -

820 (Pa. Super. 2014) (citations omitted) (stating, in part, that "on issues of credibility and weight of the evidence, we defer to the findings of the trial [court.] … The parties cannot dictate the amount of weight the trial court places on evidence").

Upon review, we conclude that the trial court carefully and thoroughly considered the best interests of D.M. in fashioning its custody award. The record overwhelmingly supports the trial court's decision, based in large part, on finding that D.M. has a "history of misconduct with technology while attending various schools in Pennsylvania. Th[e trial c]ourt heard testimony of four (4) separate incidents during which [D.M.] misused school technology. All of these incidents led to punishment for [D.M.], and ultimately led to, contributed to, and were cause for his withdrawal from Radnor School District." Trial Court Opinion, 12/3/15, at 9. As such, we discern no abuse of discretion.

Based on the foregoing, we conclude that the entirety of the trial court opinions comprehensively expound on Mother's issues. Accordingly, we adopt and incorporate the trial court's November 10, 2015 order and December 3, 2015 opinion with this memorandum in affirming the November 10, 2015 custody order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/24/2016

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

| | | | |
|---|---|---|---|
| P. M. | | : | |
| | Plaintiff | : | |
| v. | | : | No.: 2000-014826 |
| | | : | |
| L. B. M. | | : | |
| | Defendant | : | |
| | | : | IN CUSTODY |

Francis Urso, Esquire for Plaintiff
Jeanne Bakker, Esquire for Defendant

## FINAL CUSTODY ORDER

AND NOW, to wit, this 9th day of November 2015, upon consideration of the

Petition to Modify Custody and Petition for Relocation both filed by Father on April 14, 2015,

and the Trial held on August 26, 2015 and September 11, 2015, it is hereby ORDERED and

DECREED as follows:

### A. Procedural History

1. Plaintiff/Father, P. M.                  , hereinafter "Father," has remarried and resides with his wife and wife's child at       Rawhide Court, Bonita, CA , the suburbs of San Diego, California.

2. Defendant/Mother, L. B. M.                   , hereinafter "Mother," remains single, resides with the parties' son D. M.              at       Chandler Lane, Villanova, PA 19085.

3. The parties' only child is D. M.              , presently 16 years of age, and was born on January 12, 1999. D. M   is currently in the 11th grade and is currently enrolled in the cyber school, the Commonwealth Connections Academy.

4. The parties have had several previous custody orders in this case, all of which have always provided each party with Joint Legal Custody. Additionally, this Court notes that Mother has always had primary custody and Father has always had partial physical custody which consisted of time during the school year and a significant portion of time

Page **1** of **44**

during the summer months as for most of Minor Child's life Father has lived in the State of California.

5. The first Temporary Custody Order was issued on December 4, 2002, signed by The Honorable Judge Fitzpatrick, and provided Mother and Father Joint Legal Custody, Mother Primary Physical Custody, and Father Partial Physical Custody. Additionally, Father was given eight (8) weeks of custody of Minor Child during the summer and one (1) week of custody of Minor Child during Spring Break.

6. On September 4, 2012 a Petition to Modify Existing Custody Order was filed.[1]

7. The parties were before the Master and on December 4, 2012 a Temporary Custody Order was signed by The Honorable Judge Fitzpatrick. The Temporary Custody Order provided Mother and Father Joint Legal Custody, Mother Primary Physical Custody, and Father Partial Physical Custody. Additionally, the Temporary Custody Order stated that the December 4, 2002 Temporary Custody Order remained in full force and effect.

8. This Court notes that Mother filed an immediate Motion to Modify this Temporary Custody Order seeking for Minor Child to spend less time with Father in California.

9. As a result of Mother's Motion to Modify the December 4, 2012 Temporary Custody Order the parties were again before the Master and on May 31, 2013 a new Temporary Custody Order issued by Master Wright and signed by The Honorable Nathaniel C. Nichols. This May 31, 2013 Temporary Custody Order confirmed prior Custody orders of 1/12/99[2] and 12/4/2012, which provided the parties with Joint Legal Custody, Mother with primary physical and Father with partial physical custody to be exercised over a period of eight (8) weeks during Minor Child's summer vacation from school.

10. This Court notes again that Mother filed an immediate Motion to Modify this Temporary Custody Order seeking that Minor Child spend less time with Father in California. Mother's Petition to Modify specifically requested that the Court amend Judge Fitzpatrick's December 6, 2002 Custody Order to reduce Father's eight (8) continuous weeks of summer vacation.

---

[1] This Court notes that the Petition to Modify Custody filed on September 4, 2012 was not found in the original Office of Judicial Support File and as such, this Court is unaware of which party filed the Petition to Modify Custody.

[2] This Court determines that Temporary Custody Order of May 31, 2012, contains an error. The May 31, 2013 Temporary Custody Order references a 1-12-99 Order, this Court has determines that there was no custody filing in this County between these parties in the calendar years preceding 1998 or in 1999. The parties Custody disputes and marital separation began in the Courts in the calendar year 2000, which is why this case is captioned as 2000-14826. This Court notes that January 12, 1999 is Minor Child's birthdate and as such no Temporary Custody Order or otherwise could have been issued by Court on the same day as Minor Child's birth without an Emergency Custody Petition being filed and there is no such Petition in the Office of Judicial Support of Delaware County.

11. On June 11, 2013 Mother filed a request for a Hearing De Novo appealing the May 31, 2013 Temporary Custody Order.

12. This case was assigned to the undersigned Judge.

13. This Court scheduled a Pre-Trial Conference on this matter on July 9, 2013. During the Pre-Trial Conference, this Court heard argument from the parties regarding the issue of Father's 8 weeks of partial physical custody. As of the date of the Pre-Trial Conference, Father had yet to spend any of the allotted 8 weeks with Minor Child and it was clear to the Court that without intervention Father would not be able to exercise any of his partial physical custody that summer.

   a. As a result of the argument during the Pre-Trial Conference, the Court heard from Mother, Father, and Minor Child on the sole issue of Father's partial physical custody for the summer of 2013,[3] the Court entered an Order on July 10, 2013, specifically addressing Father's 2013 summer visitation and provided Father with a specifically carved out period of partial custody/visitation with Minor Child in California from 8/6/13 to 8/19/2013.

   b. The Court's July 10, 2013 Order was issued at the request of the parties, including Minor Child, and since the parties were unable to come to an agreement in the Spring or early Summer of 2013 as to Father's visitation with Minor Child.

   c. This Court did not provide Father with more time than previously ordered; rather, it reluctantly provided and frustrated Father with less than the eight (8) weeks of summer vacation, solely due to Minor Child's prescheduled commitments and summer schedule and the lack of "summer" left following the July 9, 2013 Pre-Trial Conference. During the Pre-Trial Conference, this Court heard consistent testimony that Father had never enjoyed the full eight weeks of summer vacation in the history of this case and this Court, due to the animosity between both parties and Mother's intentional scheduling of events during Father's custodial time. This Court sought to carve out a specific agreed upon time, during the summer of 2013, that Minor Child would spend with Father and his family in California.

14. This Court notes that at the same time this Court was issuing the Temporary Custody Order regarding the 2013 summer vacation, Mother's Petition to Modify Custody was

---

[3] This Court notes that in all proceedings before this Court, with the exception of day 2 (September 11, 2015) of the two day relocation and custody trial, Mother has always been a self-represented party. Additionally, this Court notes that despite repeated admonishments to the contrary, Mother always brings Minor Child to any and all proceedings before this Court and has Minor Child sitting in the body of the courtroom, with the Court requesting that Minor Child sit outside the courtroom.

simultaneously scheduled before a Master. On July 10, 2013 a Temporary Custody Order, issued by Master Wright and signed by The Honorable Spiros Angelos, stated that the case was currently on appeal with this Court and that this Court had directed this matter to be removed from the Master's list.

15. Following the July 9, 2013 Pre-Trial Conference, both the Petition to Modify as well as the request for a Hearing De Novo were consolidated for Trial to be held on October 31, 2013.

16. This Court held the first Trial in this case on October 31, 2013, this Court notes that at this time Father was **not** requesting relocation of Minor Child or primary custody, the sole issue was again the periods of partial physical custody that Father would be able to enjoy with Minor Child and that Mother would comply with. To this date, Mother has always tried to minimize Father's partial custody.

17. On November 8, 2013 the Court issued a Final Custody Order providing the parties again with Joint Legal Custody, Mother with primary physical custody and Father with partial physical custody. Additionally, this Order gave Father a ten (10) day period of custody of Minor Child at the beginning of Minor Child's summer vacation. The Order also provided Father with another separate period of three (3) continuous weeks of custody during Minor Child's summer vacation. This Court determined that this schedule was more likely to be followed by Mother and Minor Child and would enable Minor Child to attend his Boy Scout and other commitments that he has over the summer months. Father was also provided with short periods of Custody during Minor Child's Christmas and Spring break vacations, and further visits to be mutually agreed upon.

18. On April 6, 2015, Father filed his Notice of Intent to Relocate. This Court notes that Father is not seeking to relocate himself, but rather was seeking to relocate Minor Child from the Commonwealth of Pennsylvania to the State of California.

19. On April 14, 2015, Father filed both a Petition to Modify Custody and a Petition for Relocation, requesting Primary Custody of Minor Child and for Minor Child to be relocated to California to live with Father.

20. On April 23, 2015, Mother filed her objection to Father's Notice of Intent to Relocated and the Petition for Relocation.

21. In anticipation of the Custody and Relocation Trial, on April 29, 2015, this Court issued an Order which required Minor Child to undergo a psychological evaluation with Dr. V. Richard Roeder.

22. On August 26, 2015 and September 11, 2015, this Court held a Custody and Relocation Trial.

## B. Findings of Fact

1. Father is a healthy fifty six (56) year old who lives with his Wife[4] and step-child at Rawhide Court in Bonita, California. Father and his Wife testified that Bonita, California is a suburb of San Diego, California.

2. Father has resided in the California area on and off since 1999.

3. Father's current residence is a four (4) bedroom single family home on a cul-de-sac in a neighborhood near woods and canyons, where Minor Child has his own bedroom. Father testified that his neighborhood is quiet, peaceful, uneventful, and very safe. [N.T., August 26, 2015, p. 69]

4. Should Minor Child relocate and move to California with Father, Minor Child would attend, with his step-brother, Bonita Vista High School, 751 Otay Lakes Road, Chula Vista, California 91913, in the Sweetwater School District, which is a half mile from Father's residence.

5. As a teenager, Father had attended Radnor High School. Following his high school graduation, Father served in the military and has some college credits but has not graduated from college and has no formal education or degree beyond his High School Diploma. Father has a great deal of experience and expertise working with computers and the latest computer technology and has an extensive employment history in that area.

6. Father is a Senior System/Cloud Engineer for Illumina. Father has worked for this particular company since February of 2013. Father testified that his hours are generally nine to five (9-5) and that his employer permits and even encourages him to work from home two to three days a week.

7. Father testified to the specifics of his job.

> What I do, or what I did, I was brought in specifically to help Illumina launch a product to effectively take a lot of what they do in Amazon's Cloud, AWS as in Amazon Web Services. Illumina had a portfolio of software applications that are mainly used by chemists and biologists, and geneticists in their everyday work to analyze biological data samples that have been digitized and then uploaded to be processed and analyzed. My job was to recreate the big Amazon Cloud and shrink wrap it down into a very fast high speed computer system that could run on its own without

---

[4] This Court notes, only for purposes of clarification, that this is Father's third marriage.

Amazon, without the internet, in Nome, Alaska under somebody's desk. And I did that. And I built a team around me to continue that effort and it has launched off now into four or five different variations of the original. It's called BSO, BaseSpace Onsite.

[N.T., August 26, 2015, vol. I, p. 67].

8. Father's Wife is a stay at home Mom at present. Father testified that Minor Child appears to have a good relationship with his Step-mother, and Father surmised that perhaps that was because Minor Child naturally gravitates to women because that is how he grew up, surrounded by his Mother and sister.

9. Minor Child's Stepmother has a fourteen (14) year old son, J.C.          from a previous relationship who resides with Father and Father's Wife. This son is Minor Child's step-brother.

10. Father has four (4) adult sons, R.M.          , J. M.          K. M.          , and J.M.          from his first marriage, who are Minor Child's half-brothers. J. M.          and J.M.          both testified during this trial.

11. Mother has an adult daughter, S.M.          , who is Minor Child's half-sister. [5]

12. J.M.          testified that he currently resides in Kingsville, Texas and is a Lieutenant Junior Grade with the United States Navy. He is currently twenty-nine (29) years old and serves in the active military as a pilot. J.M.          testified that he has had limited interactions with Minor Child in recent years, has had some difficulty in contacting Minor Child, and that Minor Child's ability to communicate with M. family members has been restricted by Mother.

13. J.M.          further stated that he had positive interactions and communication with Minor Child during the day of trial when they were seated together outside the courtroom. He was hopeful that this interaction and relationship would continue after the trial day and the entire trial concluded.

14. J. M          candidly testified that he struggled with an addiction to computers and gaming as a teenager. This issue improved after he moved to live with Father.

15. J. M.          stated that he wanted more communication with Minor Child so that he could impart his knowledge and experiences with computers to Minor Child. He also testified that he would be available to Minor Child if Minor Child were to need him for any reason.

---

[5] This Court is unaware if Father ever legally adopted S.M.          but she is listed on Mother's witness list under this name.

16. J. M. testified that he currently resides in New York, New York, is currently thirty-one (31) years old, and is employed by Pfizer in their mergers and acquisitions department. He previously served in the United States Navy as a Surface War Officer and later graduated from the Wharton School at the University of Pennsylvania.

17. J. M. stated that he lived with Father on and off during his first tour of duty. He sees Minor Child approximately once a year, mostly due to his military obligations, and has struggled to communicate with Minor Child outside of these visits.

18. J. M. has attempted to use electronic means of communication with Minor Child but believes that Mother has impaired the communication between Minor Child and his family. After one attempt to contact Minor Child, J. M. received a reply from Mother's email address claiming to be from Minor Child.

19. J. M. testified that Minor Child did attend part of his graduation in May of 2015 in Philadelphia, Pennsylvania.

20. Father testified regarding the various Temporary Custody Orders beginning in December of 2002, issued by the Masters and this Court. These orders always provided Father with joint legal custody and partial physical custody which was to be exercised by sharing all school vacations and holidays and providing Father with *8 weeks of summer vacation.*

21. Father further testified that in the last thirteen years, from 2002 until 2015, he has never had the benefit of having Minor Child for 8 weeks of summer vacation. [N.T., August 26, 2015, vol, I, p. 79].

22. Father candidly testified that this was not due to his lack of desire or schedule but rather due to Minor Child's school and summer activity schedule, camping, field trips, boy scouts, computer camps, which prevented the 8 weeks of summer vacation, all of which Minor Child was enrolled in by Mother, without the consent of, or over the objections of, Father. [N.T., August 26, 2015, vol. I, pgs. 79-82].

23. This Court also heard testimony, which was confirmed by a thorough review of all of the Temporary Custody Orders, that the parties had been required to share the traveling expenses of Minor Child's and that Mother had not complied with those Orders.[6] This Court heard testimony that Father paid for all expenses associated with Minor Child's travel for the calendar year 2015.

---

[6] The parties November 8, 2013 Final Custody Order provides "Mother shall be responsible to pay all costs of transportation for Minor Child to return from San Diego during the two summer periods of visitation."

24. This Court notes that Mother's testimony confirmed that testimony of Father, that she had frustrated Father's custodial time in that he had never had the benefit of enjoying all eight (8) weeks of summer vacation, due to Minor Child's summer activities which she alone enrolled Minor Child in.

25. Father testified, as did Minor Child's older brothers, that at times it is near impossible to contact Minor Child via any electronic method.

26. Father testified that in his current relationship with Minor Child there is "a shield of wanton deception." [N.T., August 26, 2015, p. 89] Father explained that statement to mean that Minor Child always appears to be holding something back.

27. Father noted, and Mother's testimony conceded, that should Minor Child relocate to California to be at Father's residence, Minor Child would be physically closer to his older sister, who currently resides in the Bay Area of San Francisco, California. This Court notes that Minor Child's only sister, S     is the only sibling with whom Minor Child has primarily lived and grown up. Father unequivocally testified that he would allow "total" and "unfettered" communication and visitation with S     should this Court permit the relocation of Minor Child. [N.T., August 26, 2015, vol. I, p. 91].

28. Father testified that the relationship between Minor Child and his younger step-brother was cordial and respectful and Father opined that the relationship was not closer because the children do not see each other often.

29. Father was adamant that he has not discussed this case with Minor Child, except when Minor Child brought up the issue. Father testified that the discussion was terse and worried and that Father attempted to explain his reasons behind seeking the relocation and primary custody. Father explained to Minor Child that he wished to provide Minor Child with a positive male role model and a moral compass, particularly related to the computers and internet usage.

30. Father candidly informed the Court that despite having joint legal custody since Minor Child's birth, Mother does not often provide him with information regarding Minor Child.

31. Father candidly testified that until the incident in 2015[7], he had never been informed about any prior incidents involving Minor Child and disciplinary issues at school, including, but not limited to the elementary, middle school, and 2014 Radnor High School incidents that involved Minor Child's misuse of school computer equipment and the internet.

---

[7] This incident is fully discussed and explained herein, however for purposes of clarification the incident in 2015 refers to Minor Child's unauthorized access to, and harming of, Radnor School District's network during his sophomore year of high school. This incident led to Minor Child's removal from Radnor School District.

32. This Court heard testimony about all four incidents involving Minor Child at various schools in the Radnor School District through Dr. Roeder's psychological report, Mother's testimony, the interview between this Court and Minor Child, and the police reports and interviews conducted related to the 2014 and 2015 incidents.

33. Numerous police reports, statements, juvenile petitions, and other paperwork regarding Minor Child's 2014 and 2015 disciplinary incidents were admitted during trial under Plaintiff's Exhibit, P-9.

34. This Court heard no testimony as to whether Minor Child was Adjudicated Delinquent or whether there was a Consent Decree entered by the juvenile court. There was no testimony or evidence presented as to the disposition of the 2015 incident; however this Court is aware that the charges against Minor Child have been resolved. This Court does not know the manner in which they have been resolved.

35. This Court notes that Mother testified that a section of Dr. Roeder's psychological report detailing Minor Child's disciplinary incidents was, "a misrepresentation." [N.T., September 11, 2015, p. 19]. However Dr. Roeder's report merely details what Mother told Dr. Roeder about Minor Child's disciplinary incidents.

36. Dr. Roeder's psychological report states that Mother explained to him that Minor Child had been suspended while in fourth grade for changing his computer security clearance to a high level in his school's IT system. See Court's Exhibit, C-1, page 3.

37. About the elementary school incident Mother testified that "It was a local computer and he [Minor Child] changed his grade level – his reading level because he was feeling bored." [N.T., September 11, 2015, pg. 27].

38. Minor Child also referred to several of the past school computer incidents as "pranks" in the evaluation done by Dr. Roeder. See Court's Exhibit, C-1, page 6.

39. Father's testimony was simply that he was unaware of the incident in elementary school or the punishment resulting therefrom.

40. Dr. Roeder's report explains that Minor Child was again suspended in middle school "for changing passwords so that the teachers could not log in and give homework." See Court's Exhibit, C-1, page 3-4.

41. Mother's testimony at Trial contradicts her statements in Dr. Roeder's report. Mother's testimony regarding Minor Child's middle school disciplinary incident was as follows, "He [Minor Child] didn't change his teacher's password. He used a very simple technique to lock them out of the system." [N.T., September 11, 2015, pg. 14].

42. Mother insisted Minor Child merely, "He locked them [the teachers] out" of their computer system. Mother further explained that Minor Child "didn't change" the passwords; but, rather Minor Child realized that "when you put our password two times

or three times wrong the system locks you out...So all he did was he showed the kids if you do – if you put the wrong password three times the system locks you out." [N.T., September 11, 2015, pg. 27]. This Court notes that Minor Child used this technique for three (3) different teachers.

43. Dr. Roeder's report states Minor Child, "reported that everyone thought it was funny that he blocked his teachers from posting homework." See Court's Exhibit, C-1, page 4.

44. Again, this Court heard testimony that Father was not aware of the elementary or middle school incidents, or any punishment that resulted therefrom.

45. In regards to the incident that occurred while Minor Child was a Freshman at Radnor High School, this Court and the records refers to this incident as the 2014 incident.

46. Dr. Roeder's report further outlines Minor Child's high school disciplinary incidents and states that, "In the ninth grade, [Minor Child] was in trouble for making it impossible for people using the Radnor Township School District computers to go on the internet. He apparently lost his computer privileges for eight months." See Court's Exhibit, C-1, page 4.

47. In a Radnor High School Statement Report, submitted on February 14, 2014, Minor Child stated,

> Last week, I wanted to test a new exploit that would apparently freeze most computers that were hard-wired to the network. It worked, this exploit can be done from any computer that is hard wired to the Network. This attack consists of a series of IPv6 router advertisement packets that are flooded by the thousands. Each packet contains instructions for a computer to join the fake network. So when thousands of packets are flooded, the CPU of the computer goes up to 100% trying to join all these fake networks thus rendering the computer(s) unusable for the period of time the flood is happening.

See Plaintiff's Exhibit, P-9.

48. The 2/27/2014 Affidavit of Probable Cause outlined the incident that led to the disciplinary action taken by Radnor School District against Minor Child in 2014. The affidavit states that Radnor High School reported attacks against their IT systems on 2/10/2014, 2/11/2014, and 2/18/2014. These attacked, significantly slowed, and disrupted the school's network. Additionally, they explained that Minor Child admitted to perpetrating some of the attacks, but not all of them. See Plaintiff's Exhibit, P-9.

49. In relation to the 2014 incident, Mother testified that: "He [Minor Child] tested a stress test." "He just wanted to see how that particular stress test work." [N.T., September 11, 2015, pg. 14].

50. Mother seemingly approving of Minor Child's conduct in relation to the 2014 incident testified as follows:

> What happened, he could not test it during – most kids on that server playing games. He was providing an environment for the children to play on his computers. 60 children were playing. He could not stress test his server when all kids were playing immediately after school...So his logic was that he can stress the server while the least amount of children are on the server...And that's during the school hours. So in order for him to connect to his server during school hours when he's in school, when he has a break, when he as a free period, he created that – he bypassed the security filters – in the school district that allowed him – originally it was to access his computer to put his homework, to put some homework that he forgot.

[N.T., September 11, 2015, pg. 32].

51. Mother continued her testimony by informing this Court of Minor Child's actions by testifying that:

> He installed a legal program. It's called VPM...He installed it in the iPad. The school iPad...Because through VPM, through iPad, he can connect to his computer at home...Which originally he had done it for pulling his homework. It was basically like creating like an additional drive.
>
> Then he realized that now when he has free time he can test his server through iPad...What's happening is he's using his iPad through the VPM on iPad, through firewall of school system...Well then he goes and he initiate the stress test to his computer...He's using the school system to get to his server...So VPM crashes on the background. He doesn't even know that VPM crashed...and now - ...The traffic that's supposed to go to his server actually returned back to the school.

[N.T., September 11, 2015, pg. 32-36].

52. It was clear through Mother's testimony that she had discussed the 2014 incident thoroughly with Minor Child who had informed Mother that he had been surreptitiously connecting to his home computer for reasons other than testing his computer gaming system. Mother was not communicating this information to Father.

53. In regards to the incident that occurred while Minor Child was a Sophomore at Radnor High School, this Court and the records refers to this incident as the 2015 incident.

54. The April 21, 2015 Affidavit of Probable Cause outlined the incident that led to the disciplinary action taken by Radnor School District against Minor Child, and his eventual withdrawal from the school, in 2015.

55. The April 21, 2015 Affidavit of Probable Cause states that Radnor High School reported that they had been experiencing attacks against their computer system that slowed, froze, and crashed the school's network. Radnor High School stated that the attacks occurred every day between January 20, 2015 and January 30, 2015.

56. The April 21, 2015 Affidavit of Probable Cause also states that numerous further attacks occurred throughout February and March. Radnor High School was also able to determine that Minor Child was the owner of an IP address, as well as a the owner of the username, that perpetrated the attacks.

57. In regards to the 2015 Incident, Dr. Roeder's report further states,

> In the tenth grade his [Minor Child's] [internet] privileges were returned, but he created Internet connections at the school that bypassed content filters placed on the system, then shared this information with at least one other student who openly misused the information and shared it with others.

See Court's Exhibit C-1, page 4.

58. Mother's testimony on 2015 incident was as follows:

> In 10th grade he [Minor Child] had his business. And in order for him to maintain his business he did exactly what he tried to do for – in 9th grade. He stress test his own server that was in the house in the computer that tree of them built together. They built a powerful machine and the kids were doing exactly the same. They were stress testing his server and put his server down the way like the school network went down.

[N.T., September 11, 2015, pg. 31].

48. Minor Child discussed with the undersigned the 2015 incident as follows:

> I had no intent to do that. That was an accident. What I was doing was – you know in - we started this thing in September – this game server in like September or November and in January we started getting – you know, we had to kick people off our game server because they were just causing problems. They were, you know, being mean to people I guess. And they got a little disgruntled at being kicked off so they started basically just taking down our server with, you know, internet – they were like flooding our internet basically.
>
> So I was trying to make like protection with my computer. I was trying to block out these attacks so they wouldn't affect me because I was losing players because, you know, the server would be down at times.

So I was doing these attacks to myself, so I could, you know, emulate the same thing and try to make rules in my router to block them. And the way it basically works is I had bought a server in the Cloud that has a much higher bandwith than what I have at home. So it will basically send tons of data to my computer at home and that would – you know, that would be what they were doing. It's called load testing.

So I was at school when I was throwing these attacks. I was using a VPN so the dedicated server in the Cloud would think I'm at home doing these attacks so they were going to my home instead of the school. And I couldn't do it after school because there were people on at that time. You know, I wouldn't want to just kick people off. During school hours there's barely anyone on them. And I – there – I think there is either a misconfiguration what I was using in the iPad or it was just the app was crashing and it would hit the school.

So if I was correctly using my VPN my home computer would look like it was like telling the server to attack it. And if it was misconfigured, like it was with mine, it would look like it was coming from the school. The school was telling the dedicated server in the Cloud to attack it...From the school I created a path to my computer.

[N.T., September 11, 2015, pg. 145-149].

59. Minor Child stated "They [the school district and the police] took it too seriously," when asked about the disciplinary incident that led to his removal from Radnor High School. See Court's Exhibit, C-1, page 4.

60. Additionally Dr. Roeder's evaluation reports Minor Child, "minimized past and present incidents," as well as "minimized his culpability for the School District incident this year". See Court's Exhibit, C-1, page 4.

61. Minor Child submitted a statement to the Radnor Township Police Department regarding the 2015 incident on March 13, 2015. The statement reads,

> At school, I shared Open VPN Software with other students on the iPads which allowed them to circumvent the filter. However, I personally used this for "Remote Desktop" and being able to remotely manage game servers. I did not attack the school in any way, shape, or form. All technology used by me was only supposed to be used for my game servers that I maintain and support outside of the school. I harbor no malicious intent for interfering with Radnor High School.

See Plaintiff's Exhibit, P-9.

62. This Court notes that in his testimony Minor Child states that he was trying to test his system while in the interviews of Minor Child attached to the Affidavit of Probable Cause, Minor Child "continually stated that he did not "intentionally" cause the attacks however could not rationally explain how the attacks are taking place. Minor Child continued stating he didn't do anything wrong and gave a written statement. See Plaintiff's Exhibit, P-9.

63. Dr. Roeder stated that overall Minor Child "minimized past and present incidents." Additionally the report states that Minor Child, "indicated that his behavior in elementary school and middle school were "pranks," and that his violations of the school computer system this year were "mistakes." He seemed to have little remorse, but did express regret that he now could not go on school property for afterschool activities or any other reason." See Court's Exhibit, C-1, pages 4-5.

64. Dr. Roeder's report also states that when asked about the 2015 incident Minor Child explained that he, "did not realize that he would "get expelled from school" for his actions." See Court's Exhibit, C-1, page 5.

65. Despite all the evidence and testimony to the contrary, Mother also stated, regarding Minor Child's multiple disciplinary incidents and his use of computers, "I don't think he hacked." [N.T., September 11, 2015, pg. 19]. Mother seems to be determined to defend Minor Child from the use of the word "hacking" in regards to his disciplinary incidents. Mother has continually failed to accept and appreciate the seriousness of Minor Child's misdeeds.

66. Father testified that he became aware of the 2015 incident only after a frantic call from Mother and only after Minor Child had been placed on a ten (10) day school suspension.

67. Immediately upon learning about the incident and the suspension from Radnor Township High School, Father contacted the Radnor Township School officials to discuss options for Minor Child.

68. Father participated in a teleconference with Radnor Township School officials with Mother and S     (Minor Child's sister) being present with the school officials.

69. During the teleconference Father learned that the school officials had turned the incident over to the School District officials and as such Father and Mother learned that it was the School District's intent to expel Minor Child permanently.

70. Father and the School District officials were able to negotiate Minor Child's expulsion from Radnor Township High School for the balance of the 2014-2015 school year, the 2015-2016 school year, with the possibility of Minor Child being able to return for his Senior year 2016-2017.

71. Father had not been made aware of the search warrants executed on Minor Child's telephone or computers in relation to the 2015 incident. *See* Plaintiff's Exhibit, P-9.

72. Father stated that he was only informed of a possible criminal investigation when Minor Child arrived for his summer visitation in 2015 without electronics and Father questioned why. **Minor Child informed Father that they had been taken to be investigated. Father only then learned of the juvenile charges on August 25, 2015 when he had visited Pennsylvania for the first day of this Custody Trial.**

73. Father testified that only the day before the Custody and Relocation Trial, on August 25, 2015, did he become aware that the Delaware County District Attorney had filed a Juvenile Complaint against Minor Child and Father further testified that the information was not relayed by Mother or Minor Child but rather through Father's counsel. [N.T., August 26, 2015, vol. I, pgs. 100-101].

74. Father testified that he was unaware that Mother had hired an attorney relating to Minor Child's outstanding juvenile criminal charges or that there was an imminent Pre-Trial Juvenile Hearing scheduled for court

75. Mother's testimony was clear, that despite the fact that she was confused about paperwork she received from the juvenile court in July of 2015, she did not tell Father about possible criminal charges; however, she did hire a local attorney to represent Minor Child at any juvenile proceedings.

76. Father testified that the school records have the incorrect birthday for Minor Child, as it lists him as a year older and that Father's address is listed as the same as Mother's and Minor Child. Father suggested that Mother intentionally misled authorities as to Father's address to frustrate or prevent Father from receiving notice about Minor Child's court dates.

77. Father testified that Minor Child told him this summer, the summer of 2015 visitation, that Mother was considering sending or moving Minor Child to Northern California to live with his sister, S

78. Following the meeting with Father, via teleconference, Mother met with the Radnor School District superintendent. The superintendent gave Mother a letter that stated that Mother and Father twenty-four (24) hours to either voluntarily withdraw Minor Child from Radnor School District or he would be expelled from Radnor High School.

79. Father also testified that he was not consulted or informed before Minor Child was enrolled in his current school, Commonwealth Connections Academy.

80. As a result of the agreement between Minor Child, Mother, Father, and Radnor High School officials, Minor Child was unenrolled from Radnor High School and Minor Child

began attending the Commonwealth Connections Academy in March of 2015, to complete his Sophomore year of high school.

81. Father testified that he and Mother did not have any discussion regarding possible other schooling after Minor Child's removal from Radnor High School.

82. This Court heard testimony from Michael Wilson, Director of Government Relations and Outreach at the Commonwealth Connections Academy. The Commonwealth Connections Academy is a Cyber Charter School for grades K-12 in the Commonwealth of Pennsylvania that is Middle States accredited.

83. Commonwealth Connections Academy has nine thousand (9,000) students currently enrolled that use the internet to access classes during traditional school hours, as well as non-traditional school hours, while following the same standards as public schools in the Commonwealth by requiring 180 calendar days of attendance by each student.

84. During his various school lessons and day, Minor Child interacts with the teacher as well as the other students in the particular class. Minor Child uses the internet for these lessons and interactions

85. Commonwealth Connections Academy has clubs and other activities that Minor Child could attend and engage in that would enable him to interact with other students beyond a computer screen.

86. Commonwealth Connections Academy requires a parent to sign a contract for a learning coach, who would be responsible to speak with teachers and sign off on their child's attendance.

87. In addition to the cyber aspect of Commonwealth Connections Academy there are eight (8) facilities across the Commonwealth of Pennsylvania where the staff is located and where the students are able to seek additional educational support.

88. Mr. Wilson was not familiar with the details of why Minor Child began attending Commonwealth Connections Academy in March of 2015; however, Minor Child remains enrolled with Commonwealth Connections Academy for the 2015-2016 school year.

89. Mr. Wilson testified that Commonwealth Connections Academy tracks attendance, as well as progress, and that a student cannot advance in his or her lessons until they have demonstrated content mastery of a subject.

90. Mr. Wilson testified that Minor Child was attending school from Monday to Friday in six hour increments and appeared to be performing well within the Commonwealth Connections Academy structure.

91. Mr. Wilson was unsure if Minor Child was Adjudicated Delinquent if or how that may affect his enrollment at Commonwealth Connections Academy.

92. Mother stated that she currently has "total control" of Minor Child's schooling. [N.T., August 26 2015, p. 309].

93. Mother additionally testified that she enrolled Minor Child in Commonwealth Connections Academy without the approval of Father.

94. Mother stated that she enrolled Minor Child in Computer Camp as well as Boy Scout Camp in the summer of 2015 over the objections of, and without permission from, Father.

95. Mother testified that she did not discuss engaging a "mentor" for Minor Child with Father. However, Mother did hire a "mentor" for Minor Child. Mother stated that the "mentor" was a college student who owned his own business and who could put Minor Child "on the right path." This "mentor" lived in Florida and never met with Minor Child in person. The "mentor" and Minor Child communicated over the phone and computer. This "mentor" was in contact with Minor Child for approximately three (3) months and is no longer working with Minor Child.

96. Mother testified that she did not inform Father that she wanted Minor Child to see a psychologist before she set up an appointment for Minor Child with a psychologist. Additionally Mother stated that she plans to set up further appointments with psychologists for evaluations for Minor Child, but has not provided Father with any information about said appointments or even informed him of these plans.

97. Mother testified that she enrolled Minor Child in Delaware County Community College without the knowledge or consent of Father.

98. Mother stated repeatedly that she trusts Minor Child's judgment "completely." [N.T., September 11, 2015, p. 324]

99. Mother asserted that Minor Child is "nearly perfect" multiple times. [N.T., September 11, 2015, p. 13]

100. Mother seems to be in complete denial regarding Minor Child's repeated attempts to hack into and disrupt the computer systems of Radnor School District. Mother stated that Minor Child's disruptions of Radnor School District's IT Systems were the School District's fault because "the system was not adequate" and Minor Child merely wanted to test the system's capabilities. [N.T., September 11, 2015, p. 15].

101. Furthermore, Mother stated that Minor Child had given the School District "a wake up call" by hacking into the system and showing the School District where it was vulnerable. [N.T., September 11, 2015, p. 16].

102. Mother continually denies Minor Child's culpability in these incidents and continually attempts to portray his actions in a positive light.

103. Mother stated that Minor Child does not want to leave friends behind should he move to California. Mother additionally stated that at least one of these friends also participated in the disruption of Radnor School District's computer systems.

104. Mother has gone so far as to frequently state that she does not believe that Minor Child has hacked into any computer systems.

105. Mother provided testimony to this Court that Minor Child learned his lesson after every computer-related disciplinary incident and that each incident occurred in a different set of circumstances. However, this is not entirely true as the last two incidents that led to Minor Child's withdrawal from Radnor High School both involved Minor Child overloading Radnor High School's IT Systems. Minor Child had been warned by Radnor Township School IT personnel that they were aware of his actions and he was warned not to continue. Additionally, the fact that Minor Child is changing the type of disruptive, and at times illegal, behaviors he is engaging in is not proof that Minor Child is learning from his mistakes. The fact that Minor Child is repeatedly engaging in any behavior that requires disciplinary action from his schools is actually proof that he does not seem to be learning from past mistakes.

106. There was un-contradicted testimony that Minor Child has resided with Mother since birth. Mother has provided most of Minor Child's daily care. This care included tasks like organizing his education, providing meals, and transporting Minor Child to all activities. Minor Child's worldview and life experiences have undoubtedly been colored, shaped, and formed by this custodial experience.

107. Mother has shown herself to be a fierce and devoted guardian of Minor Child. She has been highly involved in Minor Child's schooling, has ensured that he receives the support necessary through tutors, and has helped to provide academic guidance for Minor Child. However, her passionate guarding of Minor Child has served to alienate him from other loving members of his family as well as to enable Minor Child to act in a way that caused him to face repeated disciplinary action from his schools, and now criminal charges.

108. Furthermore, Mother has also made certain that Minor Child is involved in a wide variety of extracurricular activities including Boy Scouts, piano lessons, various sports including Ultimate Frisbee, and community service. However, Minor Child was enrolled in many of these activities without the consent or knowledge of Father and always interfered with Father's custodial time.

109. Mother has incredibly, astonishingly, and extraordinarily testified that she provided Minor Child with access to court documents, including all of the pleadings, communications and letters among the lawyers and courts, all custody orders, and psychological reports prepared for trial, pre-trial statements, and Father's petitions.

Mother stated that she provided Minor Child with "every single document" that has been generated for this custody case.

110. Additionally Mother stated that she felt Minor Child was "mature enough" to be exposed to court documents, that "he understands every single sentence," and that she discussed these documents and their content with Minor Child. [N.T., September 11, 2015, p. 77].

111. Mother has consistently shown poor judgment in allowing Minor Child to view any court documents and has gone as far as to say that she wanted Minor Child to view the documents so that he would be prepared for trial.

112. Mother also continues to refute that Minor Child would have been expelled from Radnor School District if he had not been voluntarily withdrawn. She continues to state this belief despite the testimony of Father, that Radnor was prepared to promptly expel Minor Child if Mother and Father had not withdrawn him.

113. Mother testified that she did not inform Father that Minor Child had been referred to the juvenile authorities, that there was an outstanding juvenile criminal petition, or provide him with any information regarding Minor Child's criminal charges or juvenile court proceedings. Mother stated that she did not inform Father of the criminal charges because she would have been humiliated to tell him about the situation and feared that he would tell her she was a bad mother.

114. Mother stated that communication between her and Father is poor because of issues with money and because she felt Father was hurting Minor Child with his reactions to Minor Child's disciplinary incidents at school.

115. Mother testified that she hopes that Minor Child has more communication with his older brothers and that she would help to facilitate a relationship among Minor Child and his brother.

116. Mother stated that she does not involve Father in the decisions she makes regarding Minor Child because he shuts her down and tells her no frequently.

117. Mother testified that even if Minor Child were able to return to Radnor School District she would not want him to do so.

118. Mother conceded that California would provide Minor Child with "a good opportunity" regarding his education with computer technology. [N.T., September 11, 2015, pg. 52].

119. In lieu of testimony a summary letter from H. C.         , the mother of a friend of Minor Child, was admitted. This letter praised Mother's parenting and described the close friendship between Minor Child and Ms. C.'s      son.

120. In lieu of testimony a summary letter from C.R. a longtime family friend, was admitted. This letter praised Mother's parenting and described the friendship between Minor Child and Ms. L's daughter.

121. In lieu of testimony a summary letter from S.G. , a longtime family friend, was admitted. This letter praised Mother's parenting.

122. In lieu of testimony a summary letter from T.O. , a longtime family friend, was admitted. This letter praised Mother's parenting and devotion to Minor Child.

123. In lieu of testimony a summary letter from B.G. , Mother's business colleague, was admitted. This letter praised Mother's parenting and devotion to Minor Child.

124. Minor Child participates in several activities including Boy Scouts, Ultimate Frisbee, piano, and volunteering.

125. Mother testified that she continually scheduled Minor Child's camps during Father's 8 weeks of summer visitation because she felt that Father was unable to care for Minor Child due to his work schedule. This Court notes that while Mother has repeatedly questioned Father's ability to care for Minor Child she has never filed any petition to reduce Father's custody, visitation, or to remove him from having joint legal custody, nor is this Court aware of any Children and Youth investigations regarding Father and Minor Child.

126. This Court conducted an interview of Minor Child in the presence of both parties' counsel.

127. Minor Child stated that he was upset by some of the things that he read in the court documents provided to him by Mother. Specifically Minor Child was upset by the content of the psychological evaluation.

128. Minor Child testified that he feels communication among Father, Mother, and himself was good until child support issues arose and Father remarried.

129. Minor Child stated that he feels Step-Mother is a very caring person, that he likes her, and that he can communicate well with her.

130. Minor Child testified that Commonwealth Connections Academy is "good," that some aspects of online schooling are "better than Radnor" including the flexibility available, and that "the classes are a lot harder." [N.T., September 11, 2015, p. 128]. However, Minor Child also testified that if given the choice he would return to Radnor High School, and that he missed his friends, having in person interaction with teachers and students, and school activities.

131. Minor Child stated that Mother acts as his "learning coach" for his schoolwork. Mother checks that Minor Child has completed his schoolwork daily.

132. Minor Child testified that he would like to attend Carnegie Mellon University but is also thinking of applying to several other schools including Stanford, in California.

133. Minor Child stated that he would prefer to live with Mother and the he enjoys his community in Pennsylvania.

134. Minor Child testified that he would like to spend more time with his half-brothers.

135. Minor Child testified that he loves Father, stating "I don't want to give anyone the impression that I don't love my father." [N.T., September 11, 2015, p. 158].

136. Minor Child testified that Mother is a "really good person." [N.T., September 11, 2015, p. 170].

137. Minor Child repeatedly testified that he feels remorse; however his remorse seems to only extend to his sadness at being excluded from Radnor School District and events on campus. Minor Child has never demonstrated remorse as to the damage caused by his actions. Instead, Minor Child has only stated that he feels remorse because he cannot return to Radnor High School and spend time with friends.

138. George A. Torre testified that he was hired by Mother to tutor Minor Child in several school subjects.

139. Mr. Torre testified that he does not have any formal training or a background in education and has not been accredited by any institutions as a tutor.

140. Mr. Torre stated he has never met Father and that he does not speak with Father. Furthermore, Mr. Torre stated that the only interaction that he had with Father was during the meeting with Radnor School District Administration to address Minor Child's withdrawal from the district, in which Father participated by phone.

141. This Court notes that Mother referred to Mr. Torre as "family" however Mr. Torre testified that he only physically interacts with Minor Child an average of one (1) to two (2) times a month and that all other work is done by phone.

142. Mr. Torre testified that his current focus with Minor Child is preparation for SAT testing and that he has been doing less tutoring of Minor Child in recent months.

143. The psychological report completed by Dr. V. Richard Roeder, Ph.D., confirmed that Dr. Roeder met with Minor Child on June 5, 2015, that Dr. Roeder had previously spoken to Father, and that Dr. Roeder had met with Mother on May 21, 2015. The meetings with Mother and Father were for the purpose of obtaining background information on Minor Child.

144. The psychological evaluation of Minor Child completed by Dr. Roeder states, Minor Child "seemed to have little remorse, but did express regret that he is not allowed on school property for afterschool activities or any other reason." See Court's Exhibit C-1, Page 5. Additionally, the report states that Minor Child "appears to regret getting into trouble and being punished, but shows little remorse for his actions." See Court's Exhibit C-1, Page 6. The evaluation also states that Minor Child, "has some tendency to be impatient and unable to delay gratification with difficulty learning from past mistakes." See Court's Exhibit C-1, page 6.

145. Minor Child stated in the evaluation, "My Mother worries that I tell my Dad too much." See Court's Exhibit C-1, page 5.

146. When asked about Father filing for custody after Minor Child's removal from Radnor High School, Minor Child told Dr. Roeder, "Me and my mom were a little annoyed about that." See Court's Exhibit, C-1, page 4.

147. Dr. Roeder found that Minor Child "seemed totally agreeable to the idea of increasing contact with his father, both physically and through "Skype."" See Court's Exhibit ,C-1, page 6.

148. Minor Child also referred to several of the past hacking incidents as "pranks" in the evaluation done by Dr. Roeder. See Court's Exhibit, C-1, page 6.

149. Minor Child stated "They took it too seriously," when asked about the disciplinary incident that led to his withdrawal from Radnor School District. See Court's Exhibit C-1, page 4. Additionally Dr. Roeder's evaluation reports Minor Child, "minimized past and present incidents," as well as "minimized his culpability for the School District incident this year." See Court's Exhibit, C-1, page 4.

150. Additionally Minor Child stated that Father, "could probably teach him a lot," about technology and cyber security. See Court's Exhibit, C-1, page 5.

151. Minor Child also stated in the evaluation that he "sometimes had trouble telling the truth." See Court's Exhibit, C-1, page 5.

152. The Court finds young D. M. as extremely intelligent, academically driven, a very good child, and loving towards both of his parents.

153. This Court did not find much of Mother's testimony to be credible as many of her statements were self-serving and contradicted other evidence that was presented.

## C. Conclusions of Law

1. The Court's paramount concern is the best interest of Minor Child.

2. This Court will consider the sixteen factors enumerated in the Title 23 Pa.C.S.A. Section 5328(a)(1) through (16) in rendering a determination of the custody of the Minor Child. Based upon Father's Petitions, this Court must also determine whether or not Father is permitted to relocate Minor Child from Delaware County to San Diego, California utilizing the ten (10) factors enumerated in Title 23 Pa.C.S.A. Section 5337(h)(1) thru (10).

3. In rendering a determination of Minor Child's best interest and as to Minor Child's relocation to live with Father, this Court considers all of the testimony and evidence presented on August 26, 2015 and September 11, 2015 Custody Trial, including the testimony of Father, Mother, Minor Child, Father's wife, Minor Child's older brothers, an Administrator from Commonwealth Connections Academy, Minor Child's tutor Dr. Roeder's report, and all other Exhibits entered into evidence during the one day Trial.

4. In rendering a determination of custody as both parties through their Petitions have requested primary custody of Minor Child, this Court must utilize the sixteen factors set forth in Section 5328(a)(1) through (16) in determining the Minor Child's best interest. This Court determines as follows:

5. This Court must evaluate, "**[w]hich party is more likely to encourage and permit frequent and continuing contact between the child and another party.**" 23 Pa.C.S.A. Section 5328(a) (1).

    a. Notwithstanding her self-serving statements at trial, Mother has demonstrated an ability, desire, and intent to thwart the relationships between Minor Child and Father as well between Minor Child and other members of Father's family.

    b. Father and Minor Child's brothers all testified that it has been near impossible to contact Minor Child at times while he has lived with Mother.

    c. Father has enthusiastically stated that he would allow Minor Child "unfettered" and "total" communication and visitation with Minor Child's sister should Minor Child move to California. [N.T., August 26, 2015, p. 91].

    d. Father has shown himself to be willing and able to promote frequent contact between Minor Child and Mother, as well as between Minor Child and all of his siblings.

e. This Court notes that there was no testimony or evidence presented that during Father's custodial periods that he has in anyway thwarted or prevented Minor Child's contact with his Mother or his sister.

f. It is evident in Dr. Roeder's report that Minor Child often finds it difficult to separate his own feelings from those of Mother.

g. Several of Minor Child's statements also illustrate how Mother's dominating and controlling presence in Minor Child's life influences Minor Child's perception of the incidents, particularly those in 2014 and 2015.

h. Mother's ever-present control in Minor Child's life has undoubtedly skewed Minor Child's view on how Father should have reacted to said incidents. When asked about Father filing for custody after Minor Child's removal from Radnor High School, Minor Child told Dr. Roeder, "Me and my mom were a little annoyed about that." See Court's Exhibit C-1, page 4. Minor Child also stated during the evaluation, "My Mother worries that I tell my Dad too much." See Court's Exhibit, C-1, page 5.

i. Mother has shown a pattern of behavior that has ultimately isolated Minor Child from other family members.

j. This Court determines that due to Mother's desire to thwart the relationships between Minor Child and Father's family, as well as Father's desire for Minor Child to maintain relationships with all members of Minor Child's family, this factor weighs in favor of Father.

6. This Court must evaluate, "**the present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.**" 23 Pa.C.S.A. Section 5328(a)(2).

   a. There were multiple police reports submitted by Mother that detailed "domestic problems" between the parties, as well as Mother's PFAs against Father, between 1998 and 2003. No arrests or convictions occurred subsequent to these police reports.

   b. This Court heard no testimony of abuse on the part of either party in this case.

   c. Therefore, this Court determines that this factor does not weigh in favor of either party having primary physical custody of Minor Child.

7. This Court must evaluate, **"the parental duties performed by each party on behalf of the child."** 23 Pa.C.S.A. Section 5328(a) (3).

   a. Minor Child has lived almost exclusively with Mother since his birth.

   b. Mother has provided the daily care for Minor Child, including the supervision of his education, since his birth.

   c. Father has not lived with Minor Child for many years and thus has not aided in the daily parental duties of Minor Child, with the exception of during Minor Child's periods of visitation with Father.

   d. During these periods of visitation both Father and Father's Wife have performed the day-to-day parental duties for Minor Child.

   e. Father had custody of all four (4) of his older sons before they reached the age of majority.

   f. Additionally, Minor Child's older sister S         was obviously a part of Father's daily life during Mother and Father's relationship. This Court is unaware of whether Father ever legally adopted S         but she bears Father's last name to this day. Additionally, based upon testimony, Mother and Father's children all remain in contact.

   g. This Court heard no testimony that Father would be unable to perform any of the daily duties required of him should Minor Child live with him or merely visit.

   h. This Court determines that this factor weighs slightly in favor of neither party having primary physical custody of Minor Child.

8. **"The need for stability and continuity in the child's education, family life and community life,"** must be evaluated. 23 Pa.C.S.A. Section 5328(a) (4).

   a. Minor Child has lived with Mother since birth. Father lived with Minor Child and Mother for a short period after Minor Child's birth. Minor Child's older sister also lived with Mother and Minor Child for most of Minor Child's life.

   b. Minor Child's family life has been consistent for the majority of his life.

   c. Minor Child has also consistently resided in the Villanova area during his life. Minor Child testified that he has known some of his friends since kindergarten.

   d. Minor Child attended Radnor School District until his withdrawal in Spring 2015. While Minor Child's education has consistently occurred in Radnor School District,

his education has also been inconsistent due to multiple disciplinary incidents. These disciplinary incidents culminated in his removal from the school district and his enrollment in Commonwealth Connections Academy.

    e. The stability in Minor Child's community, education, and family life, has all served to allow, and even encourage, Minor Child's repeated disciplinary incidents.

    f. Therefore, this Court determines that this factor weighs in favor of Father.

9. This Court must evaluate **"the availability of the extended family."** 23 Pa.C.S.A. Section 5328(a) (5).

    a. This Court notes that while Minor Child's siblings may be considered immediate, and not extended family, this Court will discuss their availability to Minor Child here due to the sibling's ages and circumstances.

    b. Minor Child's older brothers are all adults who currently reside in multiple states, including New York and Texas. Several of the brothers have children and families of their own.

    c. This Court heard testimony that the brothers have had difficulty communicating and seeing Minor Child while he is in Mother's care.

    d. In addition to Minor Child's older half-brothers, Father is married and has a step-son. This step-son resides with Father and his wife.

    e. Mother's testified that while she does not have any blood relations, other than Minor Child's older sister S. M.      , Mother does have several close friends who she considers to be family.

    f. Minor Child's older sister, S. M.      now resides in San Francisco, California.

    g. This Court notes that Father consistently and credibly testified that he would provide Minor Child with unfettered access to S   should he be awarded primary physical custody. This Court notes that there was no testimony or evidence presented that during Father's custodial periods that Father has in any way thwarted or prevented Minor Child's contact with his Mother or his sister.

    h. Minor Child's paternal grandparents have experienced diminished and restricted contact with Minor Child in recent years. Should Minor Child relocate to California his paternal grandparents would be able to enjoy a greater role in Minor Child's life.

i. Therefore, this Court determines that this factor does not favor either party.

10. At this time this Court needs to evaluate Minor Children's **"sibling relationships."** 23 Pa.C.S.A. Section 5328(a) (6).

   a. Minor Child has four (4) older half-brothers from Father's previous relationship as well as a younger step-brother from Father's current marriage.

   b. Minor Child has an older half-sister from Mother's previous relationship.

   c. Minor Child grew up primarily with his older sister. Minor Child has a strong relationship with his older sister.

   d. Should Minor Child relocate to California Father would allow Minor Child to have "unfettered" and "total" access to his older sister. [N.T., August 26, 2015, p. 91]. Minor Child would also reside much closer to his older sister, who currently lives in the San Francisco area.

   e. Minor Child's relationships with his older brothers have been less consistent, due in part to the older brothers' military service.

   f. Should Minor Child primarily reside with Father in California he would be able to see his brothers more often, including during their visits to Father's home.

   g. Minor Child has a good relationship with his younger-step brother. Minor Child spends time with his step-brother during his visits to Father's home.

   h. Minor Child's older sister currently resides in the San Francisco area in California.

   i. Therefore, this Court determines that this factor weighs slightly in Father's favor.

11. This Court must consider **"the well-reasoned preference of the child, based on the child's maturity and judgment."** 23 Pa.C.S.A. Section 5328(a) (7).

   a. Minor Child is sixteen (16) years old.

   b. Minor Child has expressed a preference to remain in Pennsylvania with Mother.

   c. However, Minor Child's repeated disciplinary incidents, as well as the criminal charges that have recently been resolved in the Juvenile Court in Delaware County, give this Court cause to question his level of maturity, his decision-making abilities, and his judgment.

d. Additionally, Dr. Roeder's report states Minor Child's, "psychological testing suggests that he has some tendency to be impatient and unable to delay gratification with difficulty learning from past mistakes. He may wish to appear bold or fearless to his friends, but in doing so demonstrates poor judgment." See Court's Exhibit C-1, Page 6.

e. Minor Child readily admits that Father's computer experience, profession, and experience would provide Minor Child with some needed support.

f. Therefore, this Court determines that this factor weighs slightly in favor of Father.

12. "The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm." 23 Pa.C.S.A. Section 5328(a) (8). '

a. Dr. Roeder's report states Minor Child, "is acutely aware of the conflict between his parents, and appears to be anxious not to anger or upset either of them. [Minor Child] appears to sometimes avoid contact with his father in order not to be "in the middle."" See Court's Exhibit, C-1, Page 6.

b. Mother, shockingly and irresponsibly, provided Minor Child with complete access to any and all documents, reports, and communications that have been involved in this case.

c. While Mother may not have intended to harm the relationship between Minor Child and Father, she undoubtedly did so by allowing Minor Child access to court documents as well as Minor Child's psychological report. Minor Child made it clear that he was upset greatly by what he read in some of the documents.

d. Mother's fierce protection of Minor Child has also ultimately served to isolate Minor Child from his Family, especially from Father. The rift in the relationship between Father and Minor Child is apparent to this Court.

e. Therefore, this Court determines that this factor weighs in favor of Father.

13. This Court must evaluate, "Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." 23 Pa.C.S.A. Section 5328(a) (9).

a. Mother has been the primary caretaker in Minor Child's life.

b. Father is capable of fulfilling the necessary parental relationship and duties required for Minor Child.

c. Mother has no evidence that Father cannot provide Minor Child with a loving and stable home life.

d. Both parties have constantly been involved in Minor Child's life, and it is apparent they both love him deeply.

e. This Court determines that this factor weighs in favor of both parties having primary physical custody.

14. This Court must evaluate, **"which party is more likely to attend to the physical, emotional, developmental, educational and special needs of the child."** 23 Pa.C.S.A. Section 5328(a) (10).

a. Mother has no evidence that Father cannot provide Minor Child with a loving and stable home life.

b. Father is willing and capable to fulfil the necessary parental relationship and duties required for Minor Child.

c. Mother has failed to adequately monitor Minor Child's computer activities. Minor Child has engaged in a series of actions that have led to four serious disciplinary incidents at his schools. These incidents have escalated in seriousness from minor localized activities within his classrooms to more widespread activities that have caused major disruptions to entire networks. Minor Child's two most recent disciplinary incidents have involved criminal investigations.

d. Mother has continually demonstrated that she has not accepted the gravity of Minor Child's disciplinary incidents or his actions.

e. Mother has overly shielded Minor Child which has led to his alienation from Father and Father's family.

f. Mother's shielding of Minor Child has also led to a lack of consistent communication between Minor Child and Father as well as between Minor Child and Father's family.

g. Father's knowledge and expertise in the field of computer technology will allow him to lead by example when teaching Minor Child about the proper use of computers.

h. Father has the ability to enroll Minor Child in a traditional high school close to Father's home.

i. Therefore, this Court determines that this factor weighs in favor of Father.

15. The Court must look at "**the proximity of the residences of the parties.**" 23 Pa.C.S.A. Section 5328(a) (11).

a. Mother resides in, and plans to continue residing in, Villanova, Delaware County, Pennsylvania.

b. Father resides in, and plans to continue residing in, Bonita, California.

c. Therefore, this Court determines that this factor does not favor either party as neither party is further relocating. Mother will have the same or more custody than Father has had in prior years.

16. This Court must account for "**each party's availability to care for the child or ability to make appropriate child-care arrangements.**" 23 Pa.C.S.A. Section 5328(a) (12).

a. This Court notes that Minor Child is sixteen (16) years old and while he does not require the same level of care that a younger child would, this Court determines that Minor Child does require supervision due to his past actions that have resulted in both disciplinary consequences at school and criminal charges.

b. Father has testified that while he works full time, his company actively encourages Father to work several days a week from home. This would allow Father the ability to care for Minor Child should it be necessary during the school week.

c. Additionally, Father's Wife does not currently work and is a full time stay at home mom. She would be available to care for Minor Child whenever necessary, should Minor Child move to California.

d. All of Minor Child's misdeeds have occurred during Mother's custodial time.

e. Mother claims to primarily work from home, but due to her business she must go on appointments outside of the home.

f. Therefore, this Court determines that this factor weighs slightly in favor of Father.

17. This Court must evaluate, "**the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another must be evaluated. This Court notes that a party's effort to protect a child from abuse**

**by another party is not evidence of unwillingness or inability to cooperate with that party.**" 23 Pa.C.S.A. Section 5328(a) (13).

  a. While Mother has repeatedly stated that she would like to communicate more frequently with Father, her actions have shown otherwise. Mother has regularly failed to inform Father of important events or developments in Minor Child's life, including information regarding the criminal charges facing Minor Child.

  b. Minor Child also stated during the evaluation, "My Mother worries that I tell my Dad too much." See Court's Exhibit, C-1, page 5.

  c. Additionally, Mother has made decisions about Minor Child's future without informing, or over the objections of, Father. These decisions include the choice of school for Minor Child, enrolling Minor Child in extracurricular activities, and the hiring of a tutor and a "mentor" for Minor Child.

  d. Mother has also stated that she purposefully, and repeatedly, interrupted and disrupted Father's summer custodial time with Minor Child by scheduling Minor Child's camps during Father's visitations.

  e. Therefore, this Court determines that this factor weighs in favor of Father.

18. Testimony or indication of **drug and/or alcohol abuse by any party, spouse, or other family members in the custody case.** 23 Pa.C.S.A. Section 5328(a) (14).

  a. This Court heard no testimony of drug and/or alcohol abuse on the part of Father or Mother.

  b. In light of the testimony and evidence provided, this Court determines that this factor does not weigh in favor of either party.

19. This Court must assess "**the mental and physical condition of a party or member of a party's household.**" 23 Pa.C.S.A. Section 5328(a) (15).

  a. This Court has heard no testimony that indicates that Mother is physically or mentally ill. Therefore, this Court determines that Mother is in good physical and mental health.

  b. This Court has heard no testimony that indicates that Father physically or mentally ill. Therefore, this Court determines that Father is in good physical and mental health.

c. This Court determines that, based on the evidence presented, this factor weighs in favor of neither party.

20. This Court believes that there are **"any other relevant factors,"** which are not covered in the fifteen other factors. 23 Pa.C.S.A. Section 5328(a) (16).

    a. Dr. Roeder's psychological report states that Minor Child, "appears to regret getting into trouble and being punished, but shows little remorse for his actions. His psychological testing suggests that he has some tendency to be impatient and unable to delay gratification with difficulty learning from past mistakes. He may wish to appear bold or fearless to his friends, but in doing so demonstrates poor judgment. His poor judgment has led to him being in trouble with the Radnor School District at least four times, this last time leading to his practical expulsion from school." See Court's Exhibit, C-1, Page 6.

    b. Dr. Roeder's psychological report states that Minor Child "seemed totally agreeable to the idea of increasing his contact with his father, both physically and through "Skype"" and acknowledged that his father had "a lot to teach me." See Court's Exhibit, C-1, Page 6.

    c. Dr. Roeder's psychological report states that Minor Child, "may benefit from some individual counseling around improving his social judgment, as well as helping him to deal with his split loyalties with his parents." See Court's Exhibit C-1, Page 6.

    d. Father's profession, expertise, and knowledge of advanced computer systems, as well as his knowledge of addictions caused by the extensive use of computers can provide much needed support for Minor Child.

21. In rendering a determination of custody, and relocation, this Court must utilize the ten (10) factors set forth in Section 5337(h)(1) through (10) in determining whether or not Minor Child may relocate to live with Father in California. In rendering a determination on relocation, while the moving party bears the burden of establishing whether or not the relocation will serve the best interest of *the child*, each party has the burden to establish the integrity of the motives of the request to relocate.

22. The Court must analyze **"the nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the non-relocating party, siblings and other significant persons in the child's life."** 23 Pa.C.S.A. Section 5337(h)(1).

    a. Minor Child has siblings as a result of his parents' other relationships. Minor Child has four (4) older paternal half-brothers as well as a younger paternal step-brother. Father has four (4) adult sons from a previous relationship and Father's

Wife has a son. Additionally Minor Child has an older maternal half-sister. Mother has a daughter from a previous relationship.

b. This Court heard testimony that while Minor Child has relationships with all of his siblings, he has a close relationship with his older sister as she is the sibling that Minor Child lived with during his childhood. Minor Child's older sister recently moved to California.

c. Minor Child and his older brothers have all stated that they hope to cultivate a closer relationship. Their relationships in the past have been hindered by several of the older brothers' participation in the military as well as the distance between their homes.

d. Additionally this Court heard testimony that Minor Child has a cordial relationship with his step-brother and that they enjoy their time together when Minor Child visits Father and Father's Wife. This Court finds that Minor Child spending more quality time with his step-brother, who is 14 years old and close in age to Minor Child, may be a positive experience for Minor Child.

e. Furthermore, this Court heard testimony from Minor Child, Father, and Father's Wife that Minor Child enjoys a good relationship with Father's Wife and that Minor Child feels that she is a loving, caring person.

f. Minor Child has a very strong bond with Mother. They enjoy a close relationship and Mother is greatly involved with Minor Child's activities and education.

g. Minor Child and Father have had a consistent relationship throughout Minor Child's life. However, Father's visits with Minor Child have frequently been cut short because of Minor Child's activities and Father has not been able to have all the time with Minor Child that he would like. Minor Child has also expressed a hope for more contact with Father.

h. Based upon the testimony and evidence presented, this Court determines that this factor weighs in favor of Minor Child relocating to live with Father.

23. The Court must look at **"the age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child."** Section 5337(h)(2).

a. Minor Child is currently sixteen (16) years old. Minor Child has resided primarily with only Mother during his life, while Father was present during some of the earliest periods of his life.

b. Minor Child is currently enrolled in Commonwealth Connections Academy, an online school that operates in Pennsylvania.

c. Minor Child would be enrolled in a high school located near Father should Minor Child relocate to California.

d. Minor Child has had periods of visitation with Father at his home in California throughout his life.

e. Father's employer allows Father to work from home two (2) to three (3) days each week. This ability to telecommute would allow Father to be present in much of Minor Child's daily life.

f. Father's employment allows him to enjoy flexible hours and he is knowledgeable in the field of technology. Father is well equipped to both educate Minor Child in the field of technology as well as to monitor Minor Child's use of technology.

g. Additionally, Dr. Roeder's report states Minor Child's "psychological testing suggests that he has some tendency to be impatient and unable to delay gratification with difficulty learning from past mistakes. He may wish to appear bold or fearless to his friends, but in doing so demonstrates poor judgment." See Court's Exhibit, C-1, Page 6.

h. Minor Child's is of an age to begin preparing for college and needs to learn how to properly use his computer talents. Minor Child would be well served by living with Father, who can help Minor Child learn to use his talents.

i. This Court determines, that based upon the age, developmental stage, and the educational needs of Minor Child, relocation of Minor Child to live with Father would be in Minor Child's best interests.

24. The Court must look at the **"the feasibility of preserving the relationship between the non-relocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties."** Section 5337(h)(3).

   a. Should Minor Child relocate to California, Minor Child would have the same ability to maintain a relationship with Mother as he has had with Father in the past.

   b. Mother would be able to maintain a relationship with Minor Child through phone and social media contact in addition to periods of visitation, including holidays and summer vacations.

c. Additionally, relocating to California would allow Minor Child to live in close proximity to his older sister, with who he has a close relationship.

d. This Court understands that should Minor Child relocate to California with Father his daily life will change. However, Minor Child is currently 16 years old and his daily life will undergo a drastic change upon his admission to college in two short years, regardless of which parent he lives with in the interim.

e. Based upon the testimony of Father, and the distance between the two parties' current residences, this Court determines that this factor weighs in favor of Father.

25. The Court must also factor in **"the child's preference, taking into consideration the age and maturity of the child."** Section 5337(h)(4).

    a. Minor Child is sixteen (16) years old.

    b. Minor Child testified that his preference is to remain living in Pennsylvania with Mother.

    c. This Court has serious concerns about the quality of Minor Child's judgment.

    d. Minor Child's repeated disciplinary incidents, as well as the criminal charges that have recently been resolved in the Juvenile Court in Delaware County, give this Court cause to question his level of maturity, his decision-making abilities, and his judgment.

    e. Additionally, Minor Child's judgment and biases are skewed in favor of Mother due to her indulgent and permissive parenting style and the sheer amount of time that Minor Child spends with Mother.

    f. Mother has never pushed, or even encouraged, Minor Child to spend all eight (8) weeks of his summer visitation with Father.

    g. Dr. Roeder's report states Minor Child's "psychological testing suggests that he has some tendency to be impatient and unable to delay gratification with difficulty learning from past mistakes. He may wish to appear bold or fearless to his friends, but in doing so demonstrates poor judgment." See Court's Exhibit, C-1, Page 6.

    h. Therefore, this Court determines that this factor weighs in favor of Father.

26. The Court must determine **"whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party."** Section 5337(h)(5).

a. Dr. Roeder's report states Minor Child, "Is acutely aware of the conflict between his parents, and appears to be anxious not to anger or upset either of them. [Minor Child] appears to sometimes avoid contact with his father in order not to be "in the middle."" See Court's Exhibit, C-1, Page 6.

b. Minor Child's main mode of communication with Father and his older brother's is through electronic means, Including email, Facebook, and Skype.

c. This Court heard testimony from Father, as well as Minor Child's older brothers, that Mother has isolated Minor Child from Father's family. Father and Minor Child's older brothers stated that they struggled to get in touch with Minor Child, through any means, and often did not receive responses when they reached out to Minor Child.

d. Additionally Father's period of custody during summers has consistently been interrupted or abbreviated. Mother herself testified that she has regularly scheduled camp or other activities during Father's period of summer custody. Mother has thwarted attempts by Father to have a closer relationship with Minor Child by repeatedly enrolling Minor Child in camps and activities that conflict with Father's summer visitation.

e. Furthermore, Mother provided Minor Child with unlimited access to court documents from this case. Minor Child testified that certain documents upset him, particularly documents that were filed on Father's behalf. This access to court documents undoubtedly had a negative effect on Minor Child's relationship with Father.

f. Mother made multiple self-serving statements during trial. She repeatedly asked Minor Child's older brothers to contact her should they be unable to get in touch with Minor Child during her cross examinations.

g. Several of Minor Child's statements also illustrate how Mother's extensive, ever-present and overbearing influence has served to harm the relationship between Father and Minor Child.

h. When asked about Father filing for custody after Minor Child's removal from Radnor High School, Minor Child told Dr. Roeder, "Me and my mom were a little annoyed about that." See Court's Exhibit, C-1, page 4.

i. Minor Child also stated during the evaluation, "My Mother worries that I tell my Dad too much." See Court's Exhibit, C-1, page 5.

j. Based upon the testimony, this Court determines that this factor weighs in favor of Minor Child relocating to be with Father, as Mother has an established pattern of isolating Minor Child from both his immediate and extended family.

27. Will the **"relocation will enhance the general quality of life or the _child_, including, but not limited to, financial or emotional benefit or educational opportunity."** Section 5337(h)(7).

   a. Minor Child would attend Bonita Vista High School in California should he relocate to California and live with Father. This school would provide Minor Child with social interaction, with both peers and teachers, which his current online school does not provide.

   b. Neither party has produced any evidence that Minor Child will be welcomed back to Radnor High School next year for his Senior year of High School.

   c. Mother did not present any testimony or evidence that Minor Child would be permitted to enroll in any "traditional" school in the Commonwealth of Pennsylvania. Mother candidly testified that she would prefer Minor Child to continue his high school education in an online school and not Radnor High School.

   d. This Court heard testimony that at some point, Mother, herself, considered moving Minor Child to live in California. This Court notes however, that it was Mother's intention to have Minor Child not live with Father but rather with his sister, S· , and this Court notes that this idea was not discussed with Father.

   e. Based upon his own testimony, Minor Child misses the interaction with students and campus life that a traditional brick and mortar school offers.

   f. Minor Child would undoubtedly be able to find a team and continue with his passion for Ultimate Frisbee should Minor Child relocate to California.

   g. Minor Child would be able to continue his participation in The Boy Scouts in California as they are a nation-wide organization.

   h. Relocating to California would also allow Minor Child to live and learn in a place known for its central role in the world of technology. Minor Child would also have the benefit of daily instruction from Father regarding the use of computers and other technology.

   i. This Court seriously doubts that Radnor School District will allow Minor Child to ever re-enroll in Radnor High School. This means that Minor Child would have to

continue with non-traditional forms of education should he remain with Mother in Pennsylvania.

j. Relocating to live with Father would also provide Minor Child with unfettered access to the paternal relatives from whom Minor Child has been sheltered from while living with Mother.

k. This Court determines that based upon Minor Child's immediate inability to return to Radnor School District, as well as the ability to enroll Minor Child into a high school in California, this factor weighs in favor of Minor Child relocating to California with Father.

28. The Court must assess **"the reasons and motivation of each party for seeking or opposing the relocation."** Section 5337(h)(8).

   a. Mother has repeatedly stated that she doubts Father's ability to care for Minor Child.

   b. Mother attempted to provide this Court with testimony as to Father's bad parenting by testifying that Father abuses both Minor Child and his step-son. However, Mother then immediately retracted her statement. [N.T., August 26, 2015, vol. II, p. 334].

   c. Mother appears to fear losing her hold on Minor Child. She currently controls almost every aspect of Minor Child's life.

   d. Minor Child testified that he did not want to relocate to California because he did not want to leave his friends or community in Pennsylvania. However the friends that Minor Child does not want to leave are some of the same friends who have been involved in the disciplinary actions and criminal charges that have been brought against Minor Child.

   e. Father credibly testified that he wishes to relocate Minor Child to California to provide Minor Child with guidance, support, better educational opportunities, and more access to extended family.

   f. Father is concerned with the best interests of Minor Child, including Minor Child's education, wellbeing, and the prevention of more criminal matters in the future.

   g. Therefore, this Court determines that this factor weighs in favor of Father.

29. The Court must look at **"the present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party."** Section 5337(h)(9).

a. There were multiple police reports submitted by Mother that detailed "domestic problems" between the parties, as well as Mothers PFAs against Father, between 1998 and 2003. No arrests or convictions occurred subsequent to these police reports.

b. There was no current allegation of abuse by either party. This is not a factor in this Court's determination as to whether or not Minor Child should relocate to California with Father.

30. Finally, the Court must analyze **"any other factor affecting the best interest of the child."** Section 5337(h)(10).

a. Minor Child has shown great aptitude for, and interest in, computer technology.

b. Mother has attempted to provide Minor Child with education and guidance about technology through means such as the hiring of a "mentor."

c. Mother does not work in the field of technology and did not testify to having any extraordinary knowledge or skills relating to computers.

d. Father works in the field of computer technology and possesses a wealth of knowledge and expertise on the subject.

e. Father would be able to provide Minor Child with instruction, guidance, and education about computer technology, as well as about the responsibilities that come with the use of said technology.

f. Father would also be able to better monitor Minor Child's use of technology because of his knowledge.

g. Therefore, this Court determines that this factor weighs in favor of Father.

31. Therefore, based upon the above relocation factors, this Court determines that all the above factors do support Father's request to relocate Minor Child to California, and Father's request to relocate Minor Child to California is hereby **GRANTED.**

## D. CUSTODY ORDER

Having viewed and assessed the witnesses, weighing credibility, and fully considering the best interests of the parties' Minor Child, it is hereby ORDERED AND DECREED as follows:

### 1. Legal Custody:

    a. The parties shall have joint legal custody.

        i. Each is to have equal input into the major parenting decisions;

        ii. The parties must communicate and confer on all matters of importance related to the Minor Child's health, welfare, and education with a view towards obtaining and following a harmonious policy in the Minor Child's best interest;

        iii. Each parties have equal rights and responsibilities with respect to the Minor Child; that each shall have equal input into the material and substantial matters affecting Minor Child including, without limitation, education, extra-curricular activities, religious, medical, and dental;

        iv. Both parties shall be kept aware of the Minor Child's school activities, performance, state of health, whereabouts, extra-curricular activities, sports, vacations, accidents, and shall be advised, as soon as possible, of any major illness or medical emergency;

        v. Both parties shall be given the opportunity to be in attendance at the doctor or hospital with respect to any major illness or medical emergency;

        vi. Both parties shall be advised of all sporting, school, school extra-curricular, and other extra-curricular activities, student-teacher meetings, and special school programs and concerts, and as Minor Child requests Father shall enroll Minor Child in Boy Scouts;

        vii. Both parties shall have full and unrestricted access to all school, educational, medical, physician, hospital, and health care information. Both Parents shall have the affirmative responsibility to inform school officials, teachers, coaches, therapists, physicians, and any other health care providers that the other parent is entitled to all information regarding the physical and mental health and welfare of Minor Child.

viii. The custodial parent shall make sure that the Child attends all of his activities in which they are involved with, or any new activities that both parents mutually agreed upon.

ix. Each party shall be named as the Father and Mother on all school activity, medical, and counseling forms.

2. **Physical Custody:**

   a. **Father** shall have **primary physical custody.**

      i. Father's custody shall begin no later than November 28, 2015.

         1. As the parties agree, Minor Child shall fly to San Diego, at Father's expense, on November 27th or 28th.

         2. Father shall immediately enroll Minor Child in Bonita Vista High School and Minor Child shall begin school there on November 30, 2015.

         3. Father shall inform Bonita Vista High School that Mother and Father have Joint Legal Custody and provide the school with Mother's contact information and address in Pennsylvania.

         4. Father shall pay to have Minor Child's clothing and personal belongings that may be shipped to California.

   b. **Mother** shall have **partial custody** as follows:

      i. Mother and Father shall pick a day for Minor Child to travel from San Diego to Philadelphia International Airport for summer visitation. This day shall not occur sooner than the Monday after Father's day. Mother's summer visitation shall last for seven (7) weeks.

         1. Father and Mother shall together pick the travel day.

      ii. This Court intends for Minor Child to have time with Father and friends after the end of the school year. Minor Child shall not leave for his visit with Mother sooner than the Monday after Father's day.

      iii. Minor Child's activities shall not cause this seven (7) week period to be reduced or increased, unless mutually agreed up by the parties. Father shall pay all costs associated with Minor Child's travel to and from Minor Child's summer visitation with Mother.

iv. Mother's periods of custody may be exercised in Pennsylvania, California, or as otherwise agreed upon by Mother and Father.

v. No later than thirty (30) days prior to the date of Minor Child's summer visits to Mother. Father shall pay for, and provide the round-trip tickets for, Minor Child's travel to Philadelphia. Father shall also provide Mother and Minor Child with confirmation of the round-trip tickets thirty (30) days in advance of the date of travel.

vi. Except for the summer vacation period, Mother and Father shall share the costs for all other periods of visitation equally.

vii. Mother shall have several other periods of visitation.

1. Christmas: Mother shall have Minor Child on odd years from December 23rd through December 31st, and on even years Father shall have December 24th through December 31st. Mother may visit Minor Child in California in even years from December 31st until the end of Minor Child's Christmas Break.

2. Spring Break: Mother shall have Minor Child during Spring Break, with the exact dates and times to be dictated by Minor Child's school schedule and as mutually agreed upon by the parties.

3. Thanksgiving, Easter, other Religious or Civil Holidays, and Special Occasions: The parties shall mutually agree upon visitation for all other holidays or special occasions.

4. Other: At Mother's expense she may visit Minor Child in California at any time. Mother may spend four (4) days and three (3) nights visiting Minor Child in California on any occasion. Mother must provide Father with notice of such visit thirty (30) days prior to the visit. These visits must not interrupt Minor Child's school attendance. This Court notes that due to the distance between the parties scheduling a visit for Mother's Day may be difficult. However, if Mother is in the California area on that date she is to be given custody of Minor Child for that day.

3. **Extracurriculars:** Both Parents shall share equally the costs of all extracurricular activities, Boy Scouts, and computer camps during the summer. Within thirty (30) days of the statement of said expense, the parties shall reimburse each other.

4. **Communication:** The non-custodial parent shall be encouraged by the custodial parent to have unlimited phone/skype/internet/email communication with Minor Child.

5. **Emergencies:** In the event of an emergency or injury concerning Minor Child, the party having physical Custody of Minor Child at the time of the emergency shall make any immediate decisions concerning the care of Minor Child. As soon as it is practical that party shall immediately inform the other party of the emergency and consult with him or her.

6. **School:**

   a. Minor Child shall attend Bonita Vista High School. Mother is to be provided with all Minor Child's grades, and school reports, and Mother is encouraged to attend any of Minor Child's school functions, meetings, conferences, events or trips.

   b. Mother and Father shall also make every effort to communicate regarding Minor Child's upcoming college application process. The parties should discuss all aspects of the schools, including curriculum, school size, school location, unique opportunities the schools may provide, tuition, loans, and financial aid. Mother and Father should also discuss the scheduling of visits to different colleges and universities for Minor Child and both parties are encouraged to visit schools with Minor Child.

7. **No Alienation:**

   a. The parties agree that each shall exert every reasonable effort to maintain free access and unhampered contact between Minor Child and the other parent and siblings to foster a feel of affection between Minor Child and the other parent and siblings.

   b. Neither party shall do anything that may estrange Minor Child from the other, injure their opinion as to the other, or hamper the free and natural development of their love and respect for the other parent and siblings.

   c. Minor Child shall have unfettered communication with his older sister S Minor Child may visit S as mutually agreed upon by S and Father. These visits must not interrupt Minor Child's schooling.

8. Minor Child shall undergo a full physical examination with his new pediatrician, family practitioner, or internist, upon his relocation to California. If necessary, Mother and Father shall cooperate in providing authorizations and to send any of Minor Child's medical history or records to his new doctors in California.

9. After insurance, if any, Father shall assume the expense of Minor Child attending a minimum of (5) privileged individual counseling and therapy sessions with a licensed psychologist. These privileged sessions may address issues that will assist in Minor Child's relocation to California, Minor Child's self-esteem, or other personal issues. Being privileged the psychologist shall provide no reports or records nor be required to testify in court. The Court reserves the opportunity to obtain verification of Minor Child's attendance. Within thirty (30) days of Minor Child's relocation to California, Father shall contact a psychologist and schedule the first therapy session sometime thereafter. Father shall timely advise Mother of the name, address, and phone number of the psychologist.

    a. If the therapist requests the participation of the parties, both parties are encouraged to participate to whatever extent the therapist may request.

    b. These sessions shall continue as the therapist or Minor Child shall request.

10. This Order may be further modified, by mutual agreement of the parties or upon further order of the Court.


**Notice:** No party may make a change in the residence of any child which significantly impairs the ability of the other party to exercise custodial rights without first complying with all of the applicable provisions of 23 Pa.C.S.A. §5337(c) and Pa R.C.P. No. 1915.7 regarding relocation.

BY THE COURT:

_____
BARRY C. DOZOR, J.

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION — LAW

P. M.
          Plaintiff/Appellee          :
                                       :
     v.                                :     No.: 2000-014826
                                       :
L. B. M.                               :     3421 EDA 2015
          Defendant/Appellant          :
                                       :     IN CUSTODY
                                       :

Francis Urso, Esquire for Plaintiff/Appellee
Andrew Taylor, Esquire for Defendant/Appellant

## Opinion

Dozor, J.                                    December 2nd 2015

### NATURE AND HISTORY OF THE CASE:

This Appeal is considered a direct appeal from this Court's November 9, 2015

Final Custody Order. The nature and history of the case is as follows:

L. B. M., Appellant, resides in Villanova, Pennsylvania.

Appellant was married to Appellee, P. M. Appellee resides in Bonita, CA, the

suburbs of San Diego, California. Appellee and Appellant had one child, D. M.

hereinafter Minor Child, who was born January 12, 1999 and is presently 16

years old.

The parties have had several Custody Orders over the history of this case. All of

these past custody orders have provided both parties with Joint Legal Custody as well

as Mother with Primary Physical Custody and Father with Partial Physical Custody.

Father's Partial Physical Custody has always consisted of several periods of time during the school year as well as a significant amount of time during Minor Child's summer vacation.

The first Temporary Custody Order in this case was issued on December 4, 2002 by The Honorable Judge Fitzpatrick and provided Mother and Father with Joint Legal Custody, Mother with Primary Physical Custody, and Father with Partial Physical Custody. The next Temporary Custody Order was issued by The Honorable Judge Fitzpatrick on December 4, 2012 and the parties were again provided with Joint Legal Custody, Mother again received Primary Physical Custody, and Father received Partial Physical Custody. On May 31, 2013 a new Temporary custody Order was issued by Master Wright and signed by The Honorable Nathaniel C. Nichols. This order again provided parties with Joint Legal Custody, Mother with Primary Physical Custody and Father with Partial Physical Custody.

This Court notes that Mother filed multiple Petitions to Modify Custody, specifically to reduce Minor Child's visit with Father over the summer. These Petitions were the impetus for the majority of the new Custody Orders. Mother has repeatedly filed Petitions to Modify Custody to seek a significant reduction in Father's visitation with Minor Child. Mother filed such motions after the December 4, 2012 Custody Order and after the May 31, 2013 Custody Order. On June 11, 2013 Mother filed for a Hearing De Novo appealing the May 31, 2013 Temporary Custody Order. The case was then assigned to this Court for a determination of custody.

This Court held a pre-trial conference on July 9, 2013 and heard argument about Father's period of summer visitation with Minor Child. As of the date of the pre-trial conference Father had not been able to exercise any of his visitation for 2013 and this Court found that without intervention Father would not be able to spend any of his visitation with Minor Child that summer. This Court then entered an Order on July 10, 2013 that specifically addressed Father's summer visitation and gave Father a period of partial custody/visitation from August 6th until August 19th of 2013. This Order was issued at the request of the parties and Minor Child as they were unable to come to an agreement about the dates of Father's visitation.

This Court reluctantly provided Father with less visitation time than had been provided in the previous Custody Orders as a direct result of Minor Child's prescheduled commitments and the small amount of summer vacation left before Minor Child returned to school in the fall. During this pre-trial conference this Court heard credible testimony that Father had never been able to enjoy the full eight (8) weeks of summer vacation with Minor Child that all previous custody orders had provided him. Father's continually shorten partial physical custody was due to the animosity between the parties as well as Mother's intentional scheduling of events for Minor Child during Father's visitation.

This Court notes that while this Court was issuing the Temporary Custody Order regarding Father's 2013 summer vacation, Mother's Petition to Modify Custody was scheduled before a Master. A Temporary Custody Order was issued on July 10, 2013 by Master Wright and signed by The Honorable Spiros Angelos. This Order stated that the

case was currently on appeal with this Court and that this Court had directed this matter to be removed from the Master's list. Following the July 9, 2013 pre-trial conference, both the Petition to Modify and the request for a Hearing De Novo were consolidated for Trial to be held on October 31, 2013.

At the October 31, 2013 Trial held before this Court the sole issue to be decided was Father's periods of visitation with Minor Child. This Court issued a Final Custody Order on November 8, 2013 which provided the parties again with Joint Legal Custody. Mother was provided with Primary Physical Custody and Father was provided with Partial Physical Custody. Additionally, unlike past order which provided Father with a period of eight (8) weeks of custody over the summer break; this Order gave Father an additional ten (10) day period of custody of Minor Child at the beginning of Minor Child's summer vacation. The Order also provided Father with another separate period of three (3) continuous weeks of custody during Minor Child's summer vacation. This Court determined that this schedule was more likely to be followed by Mother and Minor Child and would enable Minor Child to attend his Boy Scout and other commitments that he has over the summer months. Father was also provided with short periods of Custody during Minor Child's Christmas and Spring break vacations, and further visits to be mutually agreed upon.

On April 6, 2015 Father filed a Notice of Intent to Relocate, seeking to relocate Minor Child from Pennsylvania to California. On April 14, 2015 Father filed a Petition to Modify Custody as well as a Petition for Relocation, requesting Primary Custody of Minor Child and for Minor Child to be relocated to California to live with Father. Mother filed

Page 4 of 31

an objection to Father's Notice of Intent to Relocate and the Petition for Relocation on April 23, 2015.

Anticipating a Custody and Relocation Trial, this Court issued an Order on April 29, 2015 which required Minor Child to undergo a psychological evaluation with Dr. V. Richard Roeder, Ph.D.

This Court held a Custody and Relocation Trial on August 26, 2015 and September 11, 2015. Following the Trial, this Court issued a Final Custody Order on November 9, 2015. This Custody Order granted Father Primary Physical Custody and Mother Partial Physical Custody. Mother and Father received Joint Legal Custody. The Custody Order ordered Minor Child to move to California no later than November 28, 2015 to live with Father. Mother was granted visitation with Minor Child for seven (7) weeks during Minor Child's summer vacation as well as several other periods of visitation.

On November 12, 2015 Appellant filed an Emergency Motion to Stay[1]. The Motion was Denied by this Court on November 17, 2015. Appellant additionally filed a Children's Fast Track Appeal on November 12, 2015. Appellant's Concise Statement of Matters Complained of on Appeal, alleges the following areas of error:

1. The Trial Court erred and/or abused its discretion in analyzing the factors enumerated in 23 Pa. C.S.A. §5328 as the Court's analysis, findings of fact, and conclusions of law are not supported by the record.

2. The Trial Court erred and/or abused its discretion in analyzing the factors enumerated in 23 Pa. C.S.A. §5337(h)(1)-(10) as the Court's analysis, findings of fact, and conclusions of law are not supported by the record.

---

[1] This Court notes that Mother filed an Emergency Petition to Stay the Relocation of Minor Child with the Pennsylvania Superior Court and this Emergency Petition was Denied on November 23, 2015.

3. The Trial Court erred and/or abused its discretion in disregarding the child's preference to remain in Pennsylvania with his mother.

4. The Trial Court erred and/or abused its discretion in failing to consider the possible harm to the child in uprooting him from the care pattern he has known from a young age.

## FACTS:

L.B.M., Appellant, resides in Villanova, Pennsylvania. Appellant was previously married to Appellee, P.M., Appellee resides in Bonita, CA, the suburbs of San Diego, California. Appellee and Appellant had one child, D.M., hereinafter Minor Child, who was born January 12, 1999 and is presently 16 years old.

Minor Child has resided with his older half-sister as well as Mother for the majority of his life. Minor Child's half-sister has recently moved to the San Francisco area in California. Father resides with his wife and step-son in the suburbs of San Diego, California.

Father is a Senior System/Cloud Engineer for Illumina. Father has worked for this particular company since February of 2013. Father testified that his hours are generally nine to five (9-5) and that his employer permits and even encourages him to work from home two to three days a week. Father testified to the specifics of his job.

> What I do, or what I did, I was brought in specifically to help Illumina launch a product to effectively take a lot of what they do in Amazon's Cloud, AWS as in Amazon Web Services. Illumina had a portfolio of software applications that are mainly used by chemists and biologists, and geneticists in their everyday work to analyze biological data samples that have been digitized and then

uploaded to be processed and analyzed. My job was to recreate the big Amazon Cloud and shrink wrap it down into a very fast high speed computer system that could run on its own without Amazon, without the internet, in Nome, Alaska under somebody's desk. And I did that. And I built a team around me to continue that effort and it has launched off now into four or five different variations of the original. It's called BSO, BaseSpace Onsite.

[N.T., August 26, 2015, vol. I, p. 67].

Father's Wife is a stay at home Mom at present. Father testified that Minor Child appears to have a good relationship with his Step-mother, and Father surmised that perhaps that was because Minor Child naturally gravitates to women because that is how he grew up, surrounded by his Mother and sister. Minor Child's Stepmother has a fourteen (14) year old son, J. C., from a previous relationship who resides with Father and Father's Wife. This son is Minor Child's step-brother.

Mother has an adult daughter, S. M., who is Minor Child's half-sister. [2] Father has four (4) adult sons, from his first marriage, who are Minor Child's half-brothers. J. M. and J. M., two of Minor Child's half-brothers, testified during this trial. Both of Minor Child's brothers testified that it was very difficult, if not impossible, to communicate with Minor Child due to Mother's interference. Father also testified that he had found it challenging to contact Minor Child, and that even when he was able to speak to Minor Child that there was a "a shield of wanton deception." Father stated that Minor Child seemed to always be holding things back. [N.T., August 26, 2015, p. 89] Minor Child himself confirmed that he struggled to communicate with Father due to Mother's interference, stating in Dr.

---

[2] This Court is unaware if Father ever legally adopted S. M. but she is listed on Mother's witness list under this name.

Roeder's evaluation, "My Mother worries that I tell my Dad too much." See Court's Exhibit C-1, page 5. Dr. Roeder's evaluation additionally states that Minor Child, "is acutely aware of the conflict between his parents, and appears to be anxious not to anger or upset either of them. [Minor Child] appears to sometimes avoid contact with his father in order not to be "in the middle."" See Court's Exhibit, C-1, page 6.

Father credibly testified that he would ensure that Minor Child is able to have more contact and communication with his older brothers as well as "unfettered" and "total" communication and visitation with Minor Child's sister upon Minor Child's move to California. [N.T., August 26, 2015, p. 91]. Unlike Mother's perpetual lack of forthrightness with Father regarding Minor Child's life, Father will also provide Mother with a constant stream of communication and contact regarding any and all legal custody issues that present themselves while he has custody of Minor Child. Mother made numerous self-serving statements during Trial. These plainly self-serving statements included Mother repeatedly asking Minor Child's brothers to contact Mother in the future if they are unable to reach Minor Child and Mother assuring Minor Child's brothers that she will put them in contact with Minor Child at any time in the future. This Court found much of Mother's testimony to not be credible due to these self-serving statements. Mother's testimony also contradicted a great deal of the evidence that was presented during Trial.

Mother is self-employed and has always lived in the area of Villanova, Pennsylvania with Minor Child. Mother has shown herself to be a fierce and devoted guardian of Minor Child. She has been highly involved in Minor Child's schooling, has

ensured that he receives the support necessary through tutors, and has helped to provide academic guidance for Minor Child. However, her passionate guarding of Minor Child has served to alienate him from other loving members of his family as well as to enable Minor Child to act in a way that caused him to face repeated disciplinary action from his schools, and now criminal charges.

Mother has also made certain that Minor Child is involved in a wide variety of extracurricular activities including Boy Scouts, piano lessons, various sports including Ultimate Frisbee, and community service. However, Minor Child was enrolled in many of these activities without the consent or knowledge of Father and interfered with Father's custodial time.

Minor Child has a history of misconduct with technology while attending various schools in Pennsylvania. This Court heard testimony of four (4) separate incidents during which Minor Child misused school technology. All of these incidents led to punishment for Minor Child, and ultimately led to, contributed to, and were cause for his withdrawal from Radnor School District.

The first of these incidents occurred when Minor Child was in fourth grade. Minor Child changed his security clearance using a teacher's computer and was suspended for doing so. Dr. Roeder's psychological report states that Mother explained to him that Minor Child had been suspended while in fourth grade for changing his computer security clearance to a high level in his school's IT system. See Court's Exhibit, C-1, page 3. About the elementary school incident Mother testified that "It was a local computer and he [Minor Child] changed his grade level – his reading level because he

was feeling bored." [N.T., September 11, 2015, pg. 27]. Minor Child also referred to several of the past computer incidents as "pranks" in the evaluation done by Dr. Roeder. See Court's Exhibit, C-1, page 6. Father's testimony was simply that he was unaware of the incident in elementary school or the punishment resulting therefrom.

Minor Child was suspended for a second time while in middle school for locking teachers out of computers so that they would be unable to assign homework. Dr. Roeder's report explains that Minor Child was again suspended in middle school "for changing passwords so that the teachers could not log in and give homework." See Court's Exhibit, C-1, page 3-4. Mother testified regarding Minor Child's middle school disciplinary incident was as follows, "He [Minor Child] didn't change his teacher's password. He used a very simple technique to lock them out of the system." [N.T., September 11, 2015, pg. 14]. Mother insisted Minor Child merely, "He locked them [the teachers] out" of their computer system. Mother further explained that Minor Child "didn't change" the passwords; but, rather Minor Child realized that "when you put our password two times or three times wrong the system locks you out...So all he did was he showed the kids if you do – if you put the wrong password three times the system locks you out." [N.T., September 11, 2015, pg. 27]. This Court noted that Minor Child used this technique for three (3) different teachers. Dr. Roeder's report states Minor Child, "reported that everyone thought it was funny the he blocked his teachers from posting homework." See Court's Exhibit, C-1, page 4. Again, this Court heard testimony that Father was not aware of this incident or any punishment that resulted therefrom.

Father, despite having Joint Legal Custody, and living in Pennsylvania for some time, was never informed of any of Minor Child's transgressions by Mother, Minor Child, or Minor Child's schools. Minor Child was punished by his schools for these offenses.

In his freshman year of high school, 2014-2015 school year, Minor Child froze the Radnor School District network through a series of sophisticated hacking exploits. This incident led to a criminal investigation and disciplinary action by Radnor High School against Minor Child. Again, Father was not notified of this incident. Dr. Roeder's report further outlines Minor Child's high school disciplinary incidents and states that, "In the ninth grade, [Minor Child] was in trouble for making it impossible for people using the Radnor Township School District computers to go on the internet. He apparently lost his computer privileges [at school] for eight months." See Court's Exhibit, C-1, page 4.

During the investigation into this 2014 incident, Minor Child prepared a statement for Radnor High School which was incorporated into the record as Plaintiff's Exhibit, P-9, during this Court's Custody and Relocation Trial. In a Radnor High School Statement Report, submitted on February 14, 2014, Minor Child stated,

> Last week, I wanted to test a new exploit that would apparently freeze most computers that were hard-wired to the network. It worked, this exploit can be done from any computer that is hard wired to the Network. This attack consists of a series of IPv6 router advertisement packets that are flooded by the thousands. Each packet contains instructions for a computer to join the fake network. So when thousands of packets are flooded, the CPU of the computer goes up to 100% trying to join all these fake networks thus rendering the computer(s) unusable for the period of time the flood is happening.

*See* Plaintiff's Exhibit, P-9.

An Affidavit of Probable Cause, dated February 24, 2014, outlined the incident that led to the disciplinary action taken by Radnor School District against Minor Child in 2014. The affidavit states that Radnor High School reported attacks against their IT systems on 2/10/2014, 2/11/2014, and 2/18/2014. These attacked significantly slowed and disrupted the school's network. Additionally, they explained that Minor Child admitted to perpetrating some of the attacks, but not all of them. *See* Plaintiff's Exhibit, P-9. In relation to the 2014 incident, Mother testified that: "He [Minor Child] tested a stress test." "He just wanted to see how that particular stress test work." [N.T., September 11, 2015, pg. 14]. Mother seemingly approving of Minor Child's conduct in relation to the 2014 incident testified as follows:

> What happened, he could not test it during — most kids on that server playing games. He was providing an environment for the children to play on his computers. 60 children were playing. He could not stress test his server when all kids were playing immediately after school...So his logic was that he can stress the server while the least amount of children are on the server...And that's during the school hours. So in order for him to connect to his server during school hours when he's in school, when he has a break, when he as a free period, he created that — he bypassed the security filters — in the school district that allowed him — originally it was to access his computer to put his homework, to put some homework that he forgot.

[N.T., September 11, 2015, pg. 32].

Mother continued her testimony by informing this Court of Minor Child's actions by testifying that:

> He installed a legal program. It's called VPM...He installed it in the iPad. The school iPad...Because through VPM, through iPad, he can connect to his computer at home...Which originally he had done it

for pulling his homework. It was basically like creating like an additional drive.

Then he realized that now when he has free time he can test his server through iPad...What's happening is he's using his iPad through the VPM on iPad, through firewall of school system...Well then he goes and he initiate the stress test to his computer...He's using the school system to get to his server...So VPM crashes on the background. He doesn't even know that VPM crashed...and now ‑ ...The traffic that's supposed to go to his server actually returned back to the school.

[N.T., September 11, 2015, pg. 32-36].

It was clear through Mother's testimony that she had discussed the 2014 incident thoroughly with Minor Child who had informed Mother that he had been surreptitiously connecting to his home computer for reasons other than testing his computer gaming system.

Finally, during his Sophomore year at Radnor High School in 2015 Minor Child again used a series of hacks to slow, freeze, and even crash the Radnor High School network. Radnor High School reported that these attacks occurred every day between January 20, 2015 and January 30, 2015 as well as numerous attacks in February and March. A criminal investigation was launched by the Radnor Police Department and it was determined that Minor Child was the owner of an IP address and username that had been used to perpetrate these attacks.

In regards to the incident that occurred while Minor Child was a Sophomore at Radnor High School, this Court and the records refers to this incident as the 2015 Incident. The April 21, 2015 Affidavit of Probable Cause outlined the incident that led to the disciplinary action taken by Radnor School District against Minor Child and his

eventual withdrawal from the school, in 2015. The April 21, 2015 Affidavit of Probable

Cause states that Radnor High School reported that they had been experiencing attacks

against their computer system slowed, froze, and crashed the school's network. Radnor

High School stated that the attacks occurred every day between January 20, 2015 and

January 30, 2015. The April 21, 2015 Affidavit of Probable Cause also states that

·numerous further attacks occurred throughout February and March. Radnor High School

was also able to determine that Minor Child was the owner of an IP address, as well as

the owner of the username, that perpetrated the attacks.

In regards to the 2015 Incident, Dr. Roeder's report further states,

> In the tenth grade his [Minor Child's] [Internet] privileges were returned, but he created Internet connections at the school that bypassed content filters placed on the system, then shared this information with at least one other student who openly misused the information and shared it with others.

See Court's Exhibit C-1, page 4.

Mother's testimony on 2015 Incident was as follows:

> In 10th grade he [Minor Child] had his business. And in order for him to maintain his business he did exactly what he tried to do for – in 9th grade. He stress test his own server that was in the house in the computer that tree of them built together. They built a powerful machine and the kids were doing exactly the same. They were stress testing his server and put his server down the way like the school network went down.

[N.T., September 11, 2015, pg. 31].

Minor Child discussed with the undersigned the 2015 Incident as follows:

> I had no intent to do that. That was an accident. What I was doing was – you know in – we started this thing in September – this game server in like September or November and in January we started getting – you know, we had to kick people off our game server because they were just causing problems. They were, you know,

Page **14** of **31**

being mean to people I guess. And they got a little disgruntled at being kicked off so they started basically just taking down our server with, you know, internet -- they were like flooding our internet basically.

So I was trying to make like protection with my computer. I was trying to block out these attacks so they wouldn't affect me because I was losing players because, you know, the server would be down at times.

So I was doing these attacks to myself, so I could, you know, emulate the same thing and try to make rules in my router to block them. And the way it basically works is I had bought a server in the Cloud that has a much higher bandwith than what I have at home. So it will basically send tons of data to my computer at home and that would -- you know, that would be what they were doing. It's called load testing.

So I was at school when I was throwing these attacks. I was using a VPN so the dedicated server in the Cloud would think I'm at home doing these attacks so they were going to my home instead of the school. And I couldn't do it after school because there were people on at that time. You know, I wouldn't want to just kick people off. During school hours there's barely anyone on them. And I -- there -- I think there is either a misconfiguration what I was using in the iPad or it was just the app was crashing and it would hit the school.
So if I was correctly using my VPN my home computer would look like it was like telling the server to attack it. And if it was misconfigured, like it was with mine, it would look like it was coming from the school. The school was telling the dedicated server in the Cloud to attack it...From the school I created a path to my computer.

[N.T., September 11, 2015, pg. 145-149].

Minor Child submitted a statement to the Radnor Township Police Department regarding the 2015 incident on March 13, 2015. The statement reads,

At school, I shared Open VPN Software with other students on the iPads which allowed them to circumvent the filter. However, I personally used this for "Remote Desktop" and being able to remotely manage game servers. I did not attack the school in any

way, shape, or form. All technology used by me was only supposed to be used for m game servers that I maintain and support outside of the school. I harbor no malicious Intent for interfering with Radnor High School.

See Plaintiff's Exhibit, P-9.

Minor Child stated "They [the school district and the police] took it too seriously," when asked about the disciplinary incident that led to his removal from Radnor High School. See Court's Exhibit, C-1, page 4. Additionally Dr. Roeder's evaluation reports Minor Child, "minimized past and present incidents," as well as "minimized his culpability for the School District incident this year". See Court's Exhibit, C-1, page 4.

This Court notes that in his testimony Minor Child states that he was trying to test his system while in the interviews of Minor Child attached to the Affidavit of Probable Cause, Minor Child "continually stated that he did not "intentionally" cause the attacks however could not rationally explain how the attacks are taking place. Minor Child continued stating he didn't do anything wrong and gave a written statement." Minor Child informed this Court that he simply wanted to test how the hack works vs. wanting to test it at school vs. wanting to test it on his own systems, inconsistent all around. See Plaintiff's Exhibit, P-9. Dr. Roeder stated that overall Minor Child "minimized past and present incidents." Additionally the report states that Minor Child, "indicated that his behavior in elementary school and middle school were "pranks," and that his violations of the school computer system this year were "mistakes." He seemed to have little remorse, but did express regret that he now could not go on school property for afterschool activities or any other reason." See Court's Exhibit, C-1, pages 4-5.

Dr. Roeder's report also states that when asked about the 2015 incident Minor Child explained that he, "did not realize that he would "get expelled from school" for his actions." See Court's Exhibit, C-1, page 5. Despite all the evidence and testimony to the contrary, Mother also stated, regarding Minor Child's multiple disciplinary incidents and his use of computers, "I don't think he hacked." [N.T., September 11, 2015, pg. 19].

Father testified that he was not aware of the 2015 incident and the ensuing punishment until Mother frantically called him to inform Father that Minor Child has been placed on a ten (10) day suspension from school. Father at this point was proceeding without knowledge of the 2014 incident that occurred at Radnor High School. Father then immediately contacted Radnor Township School officials to discuss Minor Child's options and situation. Father participated in a teleconference with Radnor School officials as well as Mother and Minor Child's older sister. During this teleconference Father was told that the school officials had turned the incident and investigation over to Radnor School District officials and that Radnor School District intended to expel Minor Child from the district permanently. Father and the Radnor School District officials were able to negotiate to expel Minor Child from Radnor High School for the balance of the 2014-2015 school year, the 2015-2016 school year, and make it *possible* for Minor Child to return to Radnor High School for his senior year 2016-2017.

While Father was informed of the punishment Radnor High School had imposed on Minor Child, albeit after the punishment it had been imposed, he was not made aware of the search warrants executed on Minor Child's telephone or computers in

relation to the 2015 incident. Mother did not inform Father of the search warrants or any possible criminal investigation against Minor Child for misconduct. Father was only made aware of a possible criminal investigation against Minor Child when Minor Child arrived for his summer visitation with Father, during the summer of 2015, without any electronics. When questioned by Father as to why he had no electronics Minor Child reported that they had been taken by the police as part of an investigation. Additionally, Father was only informed of the juvenile charges that were pending against Minor Child on August 25, 2015 when he arrived in Pennsylvania for the first day of the custody trial. Father was made aware of these charges by his counsel, not by Mother or Minor Child. Again, despite having Joint Legal Custody, Mother failed to inform Father that she had hired an attorney to represent Minor child in relation to these criminal charges. At the time of the Custody and Relocation Trial, this Court was unaware as to whether Minor Child was Adjudicated Delinquent or whether there was a Consent Decree entered by the juvenile court. There was no testimony or evidence presented as to the Juvenile Court disposition of the 2015 incident; however this Court is aware that the charges against Minor Child have been resolved and Minor Child was placed on juvenile probation. This Court does not know the manner in which they have been resolved.

Mother has also consistently and purposefully failed to inform Father of events in Minor Child's life and decisions she has made on behalf of Minor Child. Mother has gone so far as to repeatedly and deliberately, by her own admission, ignore the past Custody Orders that had provided that the parties had Joint Legal Custody. Mother has consistently frustrated Father's designation of Joint Legal Custodian of Minor Child, by

either not seeking Father's input and consideration before making major life choices for Minor Child or by making major life choices for Minor Child over the objections of Father. Mother enrolled Minor Child in numerous extracurricular activities without the permission of Father. Mother enrolled Minor Child in summer activities during Father's visitation periods to shorten said visitation, and Mother consulted a psychologist and set up appointments for Minor Child without consulting Father. Mother hired both a "mentor" and a tutor for Minor Child without informing Father.

Mother did not tell Father about the incidents that occurred while Minor Child was in elementary school or middle school, and while that alone is not intolerably troubling for this Court it does show this Court, Father and Minor Child a pattern of Mother deliberately keeping Father uninformed of Minor Child's actions and conduct which only escalated to the 2014 and 2015 incidents. Mother's lack of communication and deliberate actions to keep Father unapprised of Minor Child's misconduct continued in 2014 when Minor Child was involved in his first incident of computer hacking at Radnor High School, for which Minor Child was disciplined. Mother's attempt to keep Father as uninformed as possible only came to an end when Minor Child was suspended in 2015 from Radnor High School and Minor Child was facing expulsion. It was only when Minor Child was threatened with expulsion did Mother frantically call Father to inform him of the predicament that Minor Child had gotten himself into. Although this Court notes that Mother was careful to only reveal to Father the information that she wanted to reveal and continued to keep Father clueless about the three prior computer hacking incidents.

This Court notes that Mother's nearly immediately resumed her pattern of acting as Minor Child's sole legal guardian by failing to advise Father that she had enrolled Minor Child in his current online High School and enrolling Minor Child in Delaware County Community College without Father's knowledge, consent or approval

Additionally, Mother's need for Father's assistance ended after Minor Child was voluntarily removed from Radnor High School, as Mother did not believe it was important, necessary or required to inform Father about the criminal investigation against Minor Child in 2015, the fact that search warrants had been executed, that Mother had sought the advice and counsel of an attorney and that juvenile charges were pending. This Court is convinced that if Minor Child did not visit his Father in the summer of 2015, Father would have never discovered Minor Child was facing juvenile adjudication for the 2015 incident. This Court notes that it was only because Minor Child arrived in California without his electronics, a rarity for any teenager these days, let alone Minor Child, that Father inquired as to the reason for the missing electronics and was informed by Minor Child that they had been confiscated as a result of the search warrants being issued during the criminal investigation. This Court does not doubt that Mother has made numerous other decisions that affect Minor Child's life, which this Court and Father may not be aware of.

Mother has incredibly, astonishingly and extraordinarily testified that she provided Minor Child with access to all court documents, including all of the pleadings, communications and letters among the lawyers and courts, all custody orders, and psychological reports prepared for trial, pre-trial statements, and Father's petitions.

Mother stated that she provided Minor Child with "every single document" that has been generated for this custody case. Additionally Mother stated that she felt Minor Child was "mature enough" to be exposed to court documents, that "he understands every single sentence," and that she discussed these documents and their content with Minor Child. [N.T., September 11, 2015, p. 77].

Minor Child stated that he was upset by some of the things that he read in the court documents provided to him by Mother. When asked what specifically had upset Minor Child he stated, "Well, it was actually something in the psychological evaluation that I saw. You know, my dad describing me in an unflattering way to the psychologist." [N.T., September 11, 2015, pg. 139].

Mother has consistently shown poor judgment in allowing Minor Child to view any court documents and has gone as far as to say that she wanted Minor Child to view the documents so that he would be prepared for trial. Mother also continues to refute that Minor Child would have been expelled from Radnor School District if he had not been voluntarily withdrawn. She continues to state this belief despite the testimony of Father, that Radnor was prepared to promptly expel Minor Child if Mother and Father had not withdrawn him.

Mother candidly testified that she did not inform Father that Minor Child had been referred to the juvenile authorities, that there was an outstanding juvenile petition, nor provided him with any information regarding Minor Child's criminal charges or juvenile court proceedings. Mother stated that she did not inform Father of the

criminal charges because she would have been humiliated to tell him about the situation and feared that he would tell her she was a bad mother.

## DISCUSSION:

### I. THE COURT DID NOT ERR AND/OR ABUSE ITS DISCRETION IN ANALYZING THE FACTORS ENUMERATED IN 23 PA. C.S.A. §5328 AND 23 Pa. C.S.A. §5337(h)(1)-(10) AS THE COURT'S ANALYSIS, FINDINGS OF FACT, AND CONCLUSIONS OF LAW ARE SUPPORTED BY THE RECORD.

Mother in her appeal alleges that this Court erred and abused its discretion in issuing the November 9, 2015 Final Custody Order, which provided Father with Primary Custody and relocated Minor Child to Bonita, California.

When reviewing a trial court's actions in a custody case, the Appellate Court is to review the presiding trial court's legal conclusions for abuse of discretion. The Appellate Court's scope of review is broad. *M.P. v. M.P.*, 54 A.3d 950, 953 (Pa.Super.2012). In reviewing a Trial Court's Final Custody order the Appellate Court "cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence." *Id.* Therefore, an Appellate Court will "defer to the trial judge regarding credibility and the weight of the evidence." *Id.* A Trial Court's Final Order may be rejected by the Appellate Court, "but only if they involve an error of law or are unreasonable in light of its factual findings." *Id. See also J.R.M. v. J.E.A.*, 33 A.3d 647 (Pa.Super.2011); *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa.Super.2005); *Landis v. Landis*, 869 A.2d 1003, 1011 (Pa.Super.2005). The Appellate Courts defer to a Trial Court on issues of credibility and weight of the evidence and testimony because

It is the Trial Court Judge who has had the opportunity to observe the proceedings and demeanor of the witnesses. *R.M.G., Jr. v. F.M.G.,* 986 A.2d 1234, 1237 (Pa.Super.2009). "The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion. *Id.* The test is whether the evidence of record supports the trial court's conclusions." *Ketterer v. Seifert,* 902 A.2d 533, 539 (Pa.Super.2006); *W.C.F. v. M.G.,* 2015 PA Super 102, 115 A.3d 323, 327 (2015).

In *Commonwealth v. Widmer,* 560 Pa. 308, 322, 744 A.2d 745, 753 (2000), the Pennsylvania Supreme Court defined "abuse of discretion" as follows:

> The term 'discretion' imports the exercise of judgment, wisdom, and skill so as to reach as dispassionate conclusion, with the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Widmer,* 560 Pa. at 322, 744 A.2d at 753 (quoting *Coker v. S.M. Flinger Co.,* Inc., 533 Pa. 441, 447, 625 A.2d 1181, 1184-85 (1993)); *Custer v. Cochran,* 933 A.2d 1050, 1053-54 (Pa.Super.2007)(en banc); *Mescanti v. Mescanti,* 2008 PA Super 201, 956 A.2d 1017, 1019 (2008).

This Court has clearly, and thoroughly, weighed all of the necessary factors in both 23 Pa. C.S.A. Section 5328 and 23 Pa. C.S.A. Section 5337 to determine which party should have Primary Custody of Minor Child as well as whether Minor Child should relocate to California. This Court observed the demeanor of the witnesses and weighed the credibility of their testimony and evidence. There was no abuse of discretion and the Appellate Court should affirm the Trial Court's Final Custody Order.

## II. THE TRIAL COURT DID NOT ERR AND/OR ABUSE ITS DISCRETION REGARDING THE CHILD'S PREFERENCE TO REMAIN IN PENNSYLVANIA WITH HIS MOTHER.

Appellant argues that this Court erred by disregarding Minor Child's preference to remain in Pennsylvania with Mother instead of relocating to California to live with Father. This Court did not disregard Minor Child's preference to remain with Mother in Pennsylvania. This Court in fact acknowledged and discussed Minor Child's preference in its discussion of both 23 Pa. C.S.A. Section 5328(a)(7) and Section 5337(h)(4). This Court recognized that while Minor Child would prefer to remain in Pennsylvania with Mother it is not in his best interests to do so. Minor Child's best interests are better served by living in California with Father than to continue living in Pennsylvania with Mother. This Court also determined that Minor Child's pattern of misconduct, and even criminal activity, illustrated that his maturity, judgment, and decision-making skills are questionable.

"While the express wishes of a child in a custody action are not controlling, they constitute an important factor that must be considered carefully by the trial court when determining the child's best interest." *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d

845 (1992); *Graham v. Graham,* 2002 PA Super 64, ¶ 20, 794 A.2d 912, 918 (2002). In reviewing the preference of a child in a custody case, the child's preference must be based on good reasons. *E.A.L.,* 443 Pa.Super. at 590, 662 A.2d at 1117-18. This preference must also be based on the child's maturity and intelligence. However, the weight to be given the child's preference can best be determined by the judge before whom the child appears. *Cardamone,* 442 Pa.Super. at 278, 659 A.2d at 583; *Swope v. Swope,* 455 Pa. Super. 587, 592, 689 A.2d 264, 266 (1997).

If a Court is not persuaded by the child's preference because it would not be in the child's best interests, the child's preference is simply not controlling. *Ellingsen v. Magsamen,* 337 Pa.Super. 14, 486 A.2d 456 (1984), *Altus-Baumhor v. Baumhor,* 407 Pa. Super. 276, 281, 595 A.2d 1147, 1150 (1991).

Minor Child's preference to stay in Pennsylvania with Mother is not in his best interests for numerous reasons and therefore the Court was not controlled by the preference of Minor Child. Minor Child's frequent discipline at school is of great cause for concern. Minor Child's repeated disciplinary incidents culminated in Minor Child being removed from Radnor High School and banned from re-enrolling in the school or entering the premises for the foreseeable future. Minor Child has obviously not been able to change his patterns of behavior and avoid misusing computer equipment while under Mother's care. Minor Child has also faced criminal charges for his actions with school-owned computer equipment while in the care of Mother.

Due to his disciplinary issues Minor Child is unable to attend a physical school in Pennsylvania and has been attending an online school. Minor Child testified that he

misses the ability to interact with other students and teachers and attend school and extracurricular functions. Mother testified that she acts as a "learning coach" for Minor Child's online schooling and her duties include signing off on Minor Childs attendance and speaking with his teachers. Mother additionally stated that she currently has "total control" of Minor Child's schooling. [N.T., August 26 2015, p. 309]. Which is disturbing to this Court as the prior incidents of computer hacking all occurred under the direct supervision of Mother.

In rendering the issue of custody and relocation, this Court determined that Mother was unable to provide competent guidance in the area of computers and ethics regarding computers systems which this Court determines is necessary. This Court determines that Mother, herself, believed she needed outside help as she hired Minor Child a "mentor" in the area of computer technology. This Court notes that Mother herself continued to testify that she was not technologically savvy and the record is well developed that Father is more than competent in this area to assist Minor Child. Father however, due to his background in the field of computer technology, is both willing and able to provide Minor Child with continuing guidance, education, and supervision about not only computer technology but also the responsibilities that come along w/ using technology. Father is also uniquely capable of helping Minor Child because he has had custody of the four older boys who have had similar issues, including an addiction to computers/gaming. All of the older boys are now flourishing and enjoy a close relationship with their Father and Father's family despite the circumstances that they experienced.

Mother's actions have also been directly contrary to Minor Child's best interests. Mother testified that she has repeatedly scheduled camps and activities during Father's scheduled summer visitation with Minor Child. Mother has purposefully kept Father from enjoying the full amount of visitation with Minor Child provided by past custody orders for years. Mother has consistently thwarted the relationship between Father and Minor Child by not allowing Father to have his full visitation with Minor Child, as well as providing Minor Child with Court Documents that have undoubtedly negatively shaped and influenced the way in which Minor Child views Father. This Court notes that Minor Child informed the Court that his views about Father had changed based upon Mother's egregious actions of providing Minor Child with the Court documents. Minor Child stated that he was upset by some of the things that he read in the court documents provided to him by Mother. When asked what specifically had upset Minor Child he stated, "Well, it was actually something in the psychological evaluation that I saw. You know, my dad describing me in an unflattering way to the psychologist." [N.T., September 11, 2015, pg. 139].

Mother testified that she purposefully scheduled Minor Child's summer activities during Father's custodial periods and stated that she did so because she felt Father was unable to care for Minor Child due to his work schedule. This Court notes that while Mother has repeatedly questioned Father's overall ability to care for Minor Child she has never filed any petition to remove him from having joint legal custody, nor is this Court aware of any ongoing or past Children and Youth investigations regarding Father and Minor Child.

Page **27** of **31**

Therefore, this Court did not err in determining that Minor Child's preference was not in his best interests.

### III. THE TRIAL COURT DID NOT ERR AND/OR ABUSE ITS DISCRETION BY FAILING TO CONSIDER THE POSSIBLE HARM TO THE CHILD IN UPROOTING HIM FROM THE CARE PATTERN HE HAS KNOWN FROM A YOUNG AGE.

Appellant's next allegation of error by this Court is that this Court erred by not considering the possible harm to Minor Child that could occur as a result of his relocation to California. This Court notes that analyzing, "the possible harm to the child in uprooting him from the care pattern he has known from a young age" is not one of the factors that a court must analyze when deciding the relocation of a child or the primary custody of a child under **23 Pa.C.S.A. Section 5337 or 23 Pa.C.S.A. Section 5328.** However this Court did consider the possible harm to Minor Child that could stem from uprooting him from the care pattern he has known from a young age. This consideration was paramount in several factors including, but not limited to, this Court's analysis of whether, "relocation will enhance the general quality of life or the _child_, including, but not limited to, financial or emotional benefit or educational opportunity." **Section 5337(h)(7)**, "the nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the non-relocating party, siblings and other significant persons in the child's life." **23 Pa.C.S.A. Section 5337(h)(1)**, "each party's availability to care for the child or ability to make appropriate child-care arrangements." **23 Pa.C.S.A. Section 5328(a) (12)**, "which party is more likely to attend to the physical, emotional, developmental,

educational and special needs of the child." **23 Pa.C.S.A. Section 5328(a) (10),** "Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." **23 Pa.C.S.A. Section 5328(a) (9),** "The need for stability and continuity in the child's education, family life and community life," must be evaluated. **23 Pa.C.S.A. Section 5328(a) (4),** and "the parental duties performed by each party on behalf of the child." **23 Pa.C.S.A. § 5328(a) (3).** This Court analyzed all of these factors and determined that they weighed in favor of Father having Primary Physical Custody and Minor Child relocating to California to live with Father.

This Court also considered the benefits that Minor Child will enjoy from his relocation to California to live with Father. These benefits are numerous and significant, and include Father's expertise in the field of computer technology and his ability to mentor Minor Child about computer technology, the chance to live and learn in California which is renowned for its central role in the world of technology, Minor Child's opportunity to attend a high school that would provide him with social interaction, with both peers and teachers, as well as more contact with members of Father's family. Minor Child will also be able to continue his ardent, fervent, passionate participation in both Boy Scouts and Ultimate Frisbee upon his move to live with Father as both of these activities have organizations based in California. Father's steadfastly and credibly testified that Minor Child would have unfettered access with his only sister. This Court found that the number of possible benefits overwhelming exceeded any possible repercussions Minor Child could experience from this move.

Page **29** of **31**

Furthermore, this Court considered whether Minor Child's best interests would be served if he were allowed to remain in the same care pattern he has known from a young age. Under this care pattern Minor Child has repeatedly engaged in a course of conduct that has led to multiple disciplinary actions from his schools, and ultimately led to his removal from Radnor School District as well as the filing of criminal charges against him. This care pattern by Mother also included the exclusion of Father from all major life decisions and the alienation of Father and Father's family from Minor Child. Mother has also repeatedly exercised poor judgment. Mother has consistently ignored the requirements of joint legal custody by refusing to seek legally required Father's approval before making decisions for Minor Child. Mother also, by her own admission, provided Minor Child with "every single document" generated in connection with this custody case, including all court documents, pleadings, communications and letters among the lawyers and courts, all custody orders, and psychological reports prepared for trial, pre-trial statements, and Father's petitions.

The estrangement of Minor Child from Father, as a direct result of Mother's actions, has undoubtedly harmed Minor Child, Father and Minor Child's relationship, and their ability to communicate.

The record of this case, including the testimony heard at the Trial held on August 26, 2015 and September 11, 2015, fully supports this Court's analysis, findings of fact, and conclusions of law for both the factors enumerated in 23 Pa. C.S.A. Section 5328 as well as the factors enumerated in 23 Pa. C.S.A. Section 5337(h)(1)-(10).

The facts and circumstances provided in this case, and summarized above, provided this Court with sufficient evidence that Father should have Primary Custody of Minor Child and that Minor Child should relocate to California to live with Father.

**CONCLUSION:**

For all of the foregoing reasons, the Trial Court's Final Custody Order, which granted Father Primary Physical Custody, Mother Partial Physical Custody, and both parties Joint Legal Custody, dated November 9, 2015, should be affirmed.

BY THE COURT:

_____
Barry C. Dozor, J.